SUM-100

# SUMMONS
## (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

ENDORSED
FILED

2011 NOV -7 P 3:59

David H. Yamasaki, Clerk of the Superior Court
County of Santa Clara, California
By: ________ Deputy Clerk

**NOTICE TO DEFENDANT:**
***(AVISO AL DEMANDADO):***
Pivotal Payments, Inc.

**YOU ARE BEING SUED BY PLAINTIFF:**
***(LO ESTÁ DEMANDANDO EL DEMANDANTE):***
Hector Sol, d/b/a Vive Sol, and d/b/a Palo Alto Sol

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Superior Court, County of Santa Clara
191 North First Street
San Jose, CA 95113

CASE NUMBER: *(Número del Caso):* 111CV212705

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Gautam Dutta, Esq., 39270 Paseo Padre Pkwy. # 206, Fremont, CA 94538; 415.236.2048

DATE: Nov. 7, 2011 *(Fecha)* DAVID H. YAMASAKI Chief Executive Officer Clerk, by *(Secretario)* ________ Deputy *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:
3. ☑ on behalf of *(specify)*: Pivotal Payments, Inc.
   under: ☑ CCP 416.10 (corporation) ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
   ☐ other *(specify)*:
4. ☑ by personal delivery on *(date)*:

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

SUMMONS

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

ATTACHMENT CV-5012

# CIVIL LAWSUIT NOTICE

*Superior Court of California, County of Santa Clara*
*191 N. First St., San Jose, CA 95113*

CASE NUMBER: 111CV212705

**PLEASE READ THIS ENTIRE FORM**

*PLAINTIFF* (the person suing): Within 60 days after filing the lawsuit, you must serve each Defendant with the *Complaint, Summons*, an *Alternative Dispute Resolution (ADR) Information Sheet*, and a copy of this *Civil Lawsuit Notice*, and you must file written proof of such service.

*DEFENDANT* (The person sued): **You must do each of the following to protect your rights:**

1. You must file a written response to the *Complaint, using the proper legal form or format*, in the Clerk's Office of the Court, within 30 days of the date you were served with the *Summons* and *Complaint*;
2. You must serve by mail a copy of your written response on the Plaintiff's attorney or on the Plaintiff if Plaintiff has no attorney (to "serve by mail" means to have an adult other than yourself mail a copy); and
3. You must attend the first Case Management Conference.

**Warning: If you, as the Defendant, do not follow these instructions, you may automatically lose this case.**

*RULES AND FORMS:* You must follow the California Rules of Court and the Superior Court of California, County of Santa Clara Local Civil Rules and use proper forms. You can obtain legal information, view the rules and receive forms, free of charge, from *the Self-Help Center at 99 Notre Dame Avenue, San Jose (408-882-2900 x-2926),* www.scselfservice.org *(Select "Civil") or from:*

- State Rules and Judicial Council Forms: www.courtinfo.ca.gov/forms and www.courtinfo.ca.gov/rules
- Local Rules and Forms: http://www.sccsuperiorcourt.org/civil/rule1toc.htm

*CASE MANAGEMENT CONFERENCE (CMC):* You must meet with the other parties and discuss the case, in person or by telephone, at least 30 calendar days before the CMC. You must also fill out, file and serve a Case Management Statement (Judicial Council form CM-110) at least 15 calendar days before the CMC.

*You or your attorney must appear at the CMC. You may ask to appear by telephone – see Local Civil Rule 8.*

*Your Case Management Judge is:* Honorable Mark Pierce *Department:* 9

*The 1st CMC is scheduled for:* (Completed by Clerk of Court)
*Date:* APR 17 2012 *Time:* 1:30 pm in Department: 9

*The next CMC is scheduled for:* (Completed by party if the 1st CMC was continued or has passed)
*Date:* ________ *Time:* ________ in Department: ________

*ALTERNATIVE DISPUTE RESOLUTION (ADR):* If all parties have appeared and filed a completed *ADR Stipulation Form* (local form CV-5008) at least 15 days before the CMC, the Court will cancel the CMC and mail notice of an ADR Status Conference. Visit the Court's website at www.sccsuperiorcourt.org/civil/ADR/ or call the ADR Administrator (408-882-2100 x-2530) for a list of ADR providers and their qualifications, services, and fees.

*WARNING:* Sanctions may be imposed if you do not follow the California Rules of Court or the Local Rules of Court.

# SANTA CLARA COUNTY SUPERIOR COURT
# ALTERNATIVE DISPUTE RESOLUTION
# INFORMATION SHEET

Many cases can be resolved to the satisfaction of all parties without the necessity of traditional litigation, which can be expensive, time consuming, and stressful. The Court finds that it is in the best interests of the parties that they participate in alternatives to traditional litigation, including arbitration, mediation, neutral evaluation, special masters and referees, and settlement conferences. Therefore, all matters shall be referred to an appropriate form of Alternative Dispute Resolution (ADR) before they are set for trial, unless there is good cause to dispense with the ADR requirement.

***What is ADR?***

ADR is the general term for a wide variety of dispute resolution processes that are alternatives to litigation. Types of ADR processes include mediation, arbitration, neutral evaluation, special masters and referees, and settlement conferences, among others forms.

***What are the advantages of choosing ADR instead of litigation?***

ADR can have a number of advantages over litigation:

- **ADR can save time.** A dispute can be resolved in a matter of months, or even weeks, while litigation can take years.
- **ADR can save money.** Attorney's fees, court costs, and expert fees can be reduced or avoided altogether.
- **ADR provides more participation.** Parties have more opportunities with ADR to express their interests and concerns, instead of focusing exclusively on legal rights.
- **ADR provides more control and flexibility.** Parties can choose the ADR process that is most likely to bring a satisfactory resolution to their dispute.
- **ADR can reduce stress.** ADR encourages cooperation and communication, while discouraging the adversarial atmosphere of litigation. Surveys of parties who have participated in an ADR process have found much greater satisfaction than with parties who have gone through litigation.

***What are the main forms of ADR offered by the Court?***

**Mediation** is an informal, confidential, flexible and non-binding process in the mediator helps the parties to understand the interests of everyone involved, and their practical and legal choices. The mediator helps the parties to communicate better, explore legal and practical settlement options, and reach an acceptable solution of the problem. The mediator does not decide the solution to the dispute; the parties do.

Mediation may be appropriate when:

- The parties want a non-adversary procedure
- The parties have a continuing business or personal relationship
- Communication problems are interfering with a resolution
- There is an emotional element involved
- The parties are interested in an injunction, consent decree, or other form of equitable relief

**Neutral evaluation**, sometimes called "Early Neutral Evaluation" or "ENE", is an informal process in which the evaluator, an experienced neutral lawyer, hears a compact presentation of both sides of the case, gives a non-binding assessment of the strengths and weaknesses on each side, and predicts the likely outcome. The evaluator can help parties to identify issues, prepare stipulations, and draft discovery plans. The parties may use the neutral's evaluation to discuss settlement.

Neutral evaluation may be appropriate when:

- The parties are far apart in their view of the law or value of the case
- The case involves a technical issue in which the evaluator has expertise
- Case planning assistance would be helpful and would save legal fees and costs
- The parties are interested in an injunction, consent decree, or other form of equitable relief

-over-

GAUTAM DUTTA, ESQ. (State Bar No. 199326)
39270 Paseo Padre Parkway # 206
Fremont, CA 94538
Telephone: 415.236.2048
Email: Dutta@BusinessandElectionLaw.com
Fax: 213.405.2416

Attorney for Plaintiff
HECTOR SOL, d/b/a VIVE SOL, and
d/b/a PALO ALTO SOL

ENDORSED COPY
2011 NOV -7 P 3:59
David H. Yamasaki, Clerk of the Superior Court
County of Santa Clara, California
By: ______ Deputy Clerk
T. Mai

CALIFORNIA SUPERIOR COURT

COUNTY OF SANTA CLARA

HECTOR SOL,
d/b/a VIVE SOL and
d/b/a PALO ALTO SOL

*Plaintiff*,

vs.

PIVOTAL PAYMENTS, INC.,
and DOES 1-20;

*Defendants*.

CASE NO. 1 11 C V 2 1 2 7 0 5

**COMPLAINT FOR PERMANENT INJUNCTION AND DAMAGES**

JURY TRIAL DEMANDED

Unlimited

**INTRODUCTION**

1. This case seeks to (a) *vindicate the rights of a local business owner* who fell victim to a corporation's malicious, oppressive, and unscrupulous business practices, and (b) *protect other business owners* by securing a permanent injunction that bans those illicit business practices.

**Plaintiff HECTOR SOL**

2. Plaintiff Hector Sol owns two Santa Clara County restaurants that provide authentic Mexican cuisine: **Vive Sol** (in Mountain View) and **Palo Alto Sol** (in Palo Alto). Vive

Sol and Palo Alto Sol are not incorporated, and conduct business under fictitious names.

**Defendant PIVOTAL PAYMENTS, INC.**

3. Defendant Pivotal Payments, Inc. ("Pivotal"), a Delaware corporation, processes credit-card payments for merchants. According to a recent Pivotal press release,[1] Pivotal processes over $7 billion in transactions per year.

4. Pivotal's corporate headquarters are located in Melville, New York, and one of its regional offices is located in Redwood City, California.[2] As described below, Mr. Sol entered into two contracts with Pivotal's predecessor-in-interest, Redwood City-based POS Card Systems ("POS").

**VENUE AND JURISDICTION**

5. Mr. Sol lives and conducts business in Santa Clara County.

6. Pivotal and its predecessor-in-interest, Redwood City-based POS, have transacted business in Santa Clara County and elsewhere in California at all relevant times. Currently, Pivotal uses POS's former Redwood City headquarters as one of its regional offices.[3]

7. At all relevant times, Pivotal committed the wrongdoing, caused or directed others to commit the wrongdoing, ratified the wrongdoing, or permitted others to commit the wrongdoing alleged in this Complaint.

**PIVOTAL PAYMENTS' WRONGDOING**

8. Last spring, Pivotal recklessly, wrongfully, and unlawfully seized $19,234.78 from the bank account of Vive Sol.

9. By stealing Vive Sol's money, Pivotal became liable for conversion, punitive damages, breach of contract, unjust enrichment, breach of the covenant of good faith and fair dealing, and violation of the Unfair Competition Law (Business and Professions Code §17200).

**THE PIVOTAL CONTRACTS**

10. In 2007, Mr. Sol entered into two contracts with POS Card Systems, Pivotal's predecessor-in-interest.

---

1 Pivotal Payments' Jan. 6, 2010 press release ("Pivotal Press Release"), attached as Exhibit 3.
2 Pivotal Press Release, Exh. 3.
3 *Id.*

11. On May 21, 2007, Mr. Sol entered into a "Merchant Agreement" with Redwood City-based POS on behalf of Palo Alto Sol (hereinafter, the "PA Sol Contract"),[4] whereby POS would process Palo Alto Sol's credit-card transactions.

12. During the life of the PA Sol Contract, POS had the right to deposit funds into Palo Alto Sol's bank account in order to remit credit-card payments made by Palo Alto Sol's customers (i.e., diners who visited Palo Alto Sol).

13. POS also had a limited right under the PA Sol Contract to withdraw funds from Palo Alto Sol's bank account in order to credit customers for disputed credit-card charges. POS would continue to retain that limited right to withdraw funds from Palo Alto Sol's bank account for 180 days after the PA Sol Contract was terminated, in order to resolve any customer disputes.[5] POS had no right during that 180-day period to withdraw funds from Palo Alto Sol's bank account for any other reason.

14. On September 18, 2007, Mr. Sol entered into a "Merchant Agreement" with Redwood City-based POS on behalf of Vive Sol (hereinafter, the "Vive Sol Contract"),[6] whereby POS would process Vive Sol's credit-card transactions.

15. During the life of the Vive Sol Contract, POS had the right to deposit funds into Vive Sol's bank account in order to remit credit-card payments made by Vive Sol's customers (i.e., diners who visited Vive Sol).

16. POS also had a limited right under the Vive Sol Contract to withdraw funds from Vive Sol's bank account in order to credit customers for disputed credit-card charges. POS would continue to retain that limited right to withdraw funds from Vive Sol's bank account for 180 days after the Vive Sol Contract was terminated, in order to resolve any customer disputes.[7] POS had no right during that 180-day period to withdraw funds from Vive Sol's bank account for any other reason.

17. Although they provided for automatically renewing, two-year terms, the PA Sol

---

[4] A redacted copy of the PA Sol Contract has been attached as Exhibit 2.
[5] PA Sol Contract, Exh. 2 art. iv, "Effect of Termination", section (b).
[6] A redacted copy of the Vive Sol Contract has been attached as Exhibit 1.
[7] Vive Sol Contract, Exh. 1 art. iv, "Effect of Termination", section (b).

Contract and the Vive Sol Contract did not require Mr. Sol to pay any penalty or fee if he terminated either contract before the end of a two-year term.[8]

18. On January 5, 2010, Pivotal announced that it had acquired POS.[9]

19. Subsequently, Mr. Sol (a) did not receive any notification from Pivotal that the Vive Sol Contract or PA Sol Contract would be amended, and (b) did not agree to amend either contract. In late September 2010, a Pivotal representative told Mr. Sol that he would obtain a discount if he signed a one-page document entitled "Schedule A".[10] Mr. Sol signed that document on September 28, 2010.[11]

**TERMINATION OF THE PIVOTAL CONTRACTS**

20. On or about October 20, 2010, Mr. Sol terminated the Vive Sol Contract and the PA Sol Contract. Subsequently, Mr. Sol did not receive any correspondence from Pivotal regarding either contract.

**PIVOTAL'S INFLICTION OF HARM**

21. On April 20, 2011, Pivotal withdrew $19,234.78 from Vive Sol's bank account, *without giving Mr. Sol any prior notice or justification* for the withdrawal (hereinafter, the "Wrongful Withdrawal").

22. As a direct result of the Wrongful Withdrawal, Mr. Sol suffered economic harm and mental anguish. Furthermore, he was forced to activate a commercial line of credit to ensure that he could meet his employees' payroll.

23. After he learned that Pivotal had made the Wrongful Withdrawal, Mr. Sol immediately asked Pivotal to reverse the Wrongful Withdrawal, and return the $19,234.78 that it had seized from Vive Sol's bank account.

24. In response, Pivotal refused to reverse the Wrongful Withdrawal and return the $19,234.78 that it had seized from Vive Sol's bank account.

25. To date, Pivotal has not provided any written explanation as to why it made the

---

8 Vive Sol Contract & PA Sol Contract, Exhs. 1 & 2 art. iv "Term; Termination", section (a).
9 Pivotal Payments' Jan. 6, 2010 press release, attached as Exhibit 3.
10 A copy of that document has been attached as Exhibit 4.
11 Exh. 4.

Wrongful Withdrawal.

**THREAT OF FUTURE HARM**

26. Mr. Sol remains deeply distressed that Pivotal could make *another* Wrongful Withdrawal from either Vive Sol's or Palo Alto Sol's bank account.

27. Upon information and belief, Pivotal has a pattern and practice of engaging in a number of acts of deceitful, unfair competition across California. Specifically, Pivotal lures and retains customers by advertising that it offers superior rates and service. However, Pivotal deliberately does not disclose that it will inflict severe monetary harm on any customer who terminates his or her relationship with Pivotal.

28. Mr. Sol does not know the true names and capacities of Defendants DOES 1 through 20, and therefore sues those Defendants by fictitious names. Based on their information and belief, Mr. Sol alleges that each of the fictitiously named Defendants is in some manner responsible for the actions described in this Complaint. When the true identities and capacities of those fictitiously named Defendants are determined, Mr. Sol will seek leave to amend this Complaint to insert those identities and capacities.

**FIRST CLAIM FOR RELIEF**

*Breach of Contract*

29. The allegations of paragraphs 1 through 28 are hereby incorporated by reference.

30. Pivotal and Mr. Sol entered into two contracts: the Vive Sol Contract and the PA Sol Contract.

31. Mr. Sol performed all or substantially all of the duties required under the Vive Sol Contract and the PA Sol Contract.

32. All conditions required for Pivotal's performance had occurred.

33. Pivotal had no right under the Vive Sol Contract or the PA Sol Contract (collectively, the "Pivotal Contracts") to penalize Mr. Sol for exercising his legal right to terminate either contract.

34. Nevertheless, after Mr. Sol terminated the Pivotal Contracts, Pivotal penalized Mr. Sol by wrongfully withdrawing $19,234.78 from Vive Sol's bank account on April 20, 2011.

35. As a direct and proximate result, Mr. Sol suffered harm in an amount according to proof.

36. Therefore, Pivotal breached the Pivotal Contracts.

**SECOND CLAIM FOR RELIEF**

*Breach of the Covenant of Good Faith and Fair Dealing*

37. The allegations of paragraphs 1 through 28 are hereby incorporated by reference.

38. Pivotal and Mr. Sol entered into two contracts: the Vive Sol Contract and the PA Sol Contract.

39. Mr. Sol performed all or substantially all of the duties required under the Vive Sol Contract and the PA Sol Contract.

40. All conditions required for Pivotal's performance had occurred.

41. Pivotal had no right to penalize Mr. Sol for exercising his legal right to terminate the Pivotal Contracts.

42. Nevertheless, after Mr. Sol terminated the Pivotal Contracts, Pivotal penalized Mr. Sol by wrongfully withdrawing $19,234.78 from Vive Sol's bank account on April 20, 2011.

43. By making the Wrongful Withdrawal, Pivotal unfairly interfered with Mr. Sol's right to receive the benefits of the Pivotal Contracts.

44. As a direct and proximate result, Mr. Sol suffered harm in an amount according to proof.

45. Therefore, Pivotal breached the covenant of good faith and fair dealing.

**THIRD CLAIM FOR RELIEF**

*Unjust Enrichment*

46. The allegations of paragraphs 1 through 9, 18, and 21 through 28 are hereby incorporated by reference.

47. Pivotal received a benefit when it withdrew $19,234.78 from Vive Sol's bank account on April 20, 2011.

48. Pivotal had no legal right to withdraw that money from Vive Sol's bank account.

49. To date, Pivotal has not returned that money to Vive Sol, and has retained that

money at Vive Sol's expense.

50. As a direct and proximate result, Mr. Sol suffered harm in an amount according to proof.

51. Therefore, Pivotal became liable for unjust enrichment.

**FOURTH CLAIM FOR RELIEF**

*Conversion*

52. The allegations of paragraphs 1 through 28 are hereby incorporated by reference.

53. Mr. Sol possessed and had a right to possess all of the money contained in Vive Sol's bank account.

54. After Mr. Sol had terminated the Pivotal Contracts, Pivotal (a) had no right to withdraw any funds from the bank account of Vive Sol or Palo Alto Sol, and (b) did not have Mr. Sol's consent to withdraw any funds from the bank account of Vive Sol or Palo Alto Sol.

55. Nevertheless, Pivotal intentionally withdrew and took possession of $19,234.78 from Vive Sol's bank account on April 20, 2011, without having any right to do so and without having Mr. Sol's consent.

56. As a direct and proximate result, Mr. Sol suffered harm in an amount according to proof.

57. Therefore, Pivotal committed the tort of conversion.

**FIFTH CLAIM FOR RELIEF**

*Punitive Damages*

58. The allegations of paragraphs 1 through 28 are hereby incorporated by reference.

59. After Mr. Sol had terminated the Pivotal Contracts, Pivotal (a) had no right to withdraw any funds from the bank account of Vive Sol or Palo Alto Sol in order to penalize Mr. Sol, and (b) did not have Mr. Sol's consent to withdraw any funds from the bank account of Vive Sol or Palo Alto Sol.

60. Nevertheless, Pivotal maliciously, wrongfully, and oppressively withdrew and took possession of $19,234.78 from Vive Sol's bank account on April 20, 2011, without having any right to do so and without having Mr. Sol's consent.

61. As a direct and proximate result, Mr. Sol suffered harm in an amount according to proof.

62. Accordingly, Pivotal became liable for punitive damages.

**SIXTH CLAIM FOR RELIEF**

*Violation of Unfair Competition Law (Business & Professions Code §17200)*

63. The allegations of paragraphs 1 through 28 are hereby incorporated by reference.

64. Beginning at an exact date unknown to Mr. Sol, Pivotal engaged in unfair, unlawful competition as defined in Business and Professions Code §17200.

65. Pivotal's acts and practices of unfair, unlawful competition include the following:

A. Pivotal committed the unfair, unlawful practice of seizing $19,234.78 from the bank account of Vive Sol *without having any legal right to do so.*

B. Pivotal may attempt to commit the unfair, unlawful practice of seizing money from the bank account of Vive Sol or Palo Alto Sol *without having any legal right to do so.*

C. Upon information and belief, Pivotal has a pattern and practice of engaging in deceitful, unfair competition *with all of its California customers.* Specifically, Pivotal lures and retains customers by advertising that it offers superior rates and service. However, Pivotal's advertisements *do not disclose* that it will *inflict severe monetary harm* on any customer who terminates his or her relationship with Pivotal.

D. Pivotal committed, may have attempted to commit, or may attempt to commit the unfair, unlawful practice of seizing money from the bank accounts of current or former Pivotal customers *without having any legal right to do so.*

**PRAYER FOR RELIEF**

Ms. Hall asks the Court to grant her the following relief:

I. General damages according to proof;

II. Special damages according to proof;

III. Punitive damages according to proof;

IV. A permanent injunction pursuant to Business and Professions Code §17203 barring Pivotal, its successors, agents, representatives, employees, and all other persons who act in concert with Pivotal from committing the acts of unfair competition alleged in the Sixth Claim for Relief.

V. All reasonable costs and expenses, including attorney's fees;

VI. All other relief that the Court deems just and equitable.

DATED: November 7, 2011

Respectfully submitted,

By: GAUTAM DUTTA, ESQ.

Attorney for Plaintiff
HECTOR SOL, d/b/a VIVE SOL, and
d/b/a PALO ALTO SOL

EXHIBIT 1

POS CARD SYSTEMS

# New Merchant Checklist

Date: 9/18/07

Business DBA: VIVE SOL

Referral Partner:

**Travel & Entertainment** — **Complete Account Number Below**

Discover: ☐ New Account Requested

American Express: ☐ New Account Requested

JCB:

**Retail Merchant Required Documentation**

*Retail store front, 75% swiped, less than $70,000 per month processing volume or Service business under $25,000 per month processing volume*

☐ Merchant Application ☐ Voided Check

☐ Site Inspection ☐ 3 Months Bankcard Statements, current & consecutive (if applicable)

*Additional documentation for Retail store front over $70,000 per month processing volume or Service business over $25,000 per month processing volume*

☐ Current Business Financials ☐ Two Years Business Tax Returns ☐ Marketing Materials ☐ Two Trade References

☐ Two Months Business Checking Account Statements, current & consecutive (if in business for less than two years)

One of the following: ☐ Non-Profit - Form 501C ☐ Corporation - Articles of Incorporation ☐ Partnership - Partnership Agreement

**Mail Order, Telephone Order or Internet business, 100% keyed, less than $25,000 per month processing volume**

☐ Merchant Application ☐ Voided Check

☐ *Site Inspection or Website* ☐ *3 Months Bankcard Statements (if applicable)*

☐ Refund Policy stated on an contract ☐ Marketing Materials

One of the following: ☐ Non-Profit - Form 501C ☐ Corporation - Articles of Incorporation ☐ Partnership - Partnership Agreement

Additional documentation for Mail Order, Telephone Order or Internet business over $25,000 to $70,000 per month processing volume

☐ Current Business Financials

☐ Two Months Business Checking Account Statements, current & consecutive (if in business for less than two years)

Additional documentation for Mail Order, Telephone Order or Internet business over $70,000 per month processing volume

☐ One Year Principal Personal Tax Returns ☐ Two Years Business Tax Returns ☐ Two Trade References

☐ Three Months Business Checking Account Statements, current & consecutive (if in business for less than two years)

**MOTO Questionnaire - REQUIRED if processing less than 75% swipe**

What percentage of sales is to: Business: ____% Individual Consumers: ____%

*Method of Marketing:* ☐ Newspaper/Magazine ☐ Television/Radio ☐ Internet ☐ Direct Mail, Brochure and/or Catalog ☐ Outbound Telemarketing Sales ☐ Other:

Who Processes the order? ☐ Merchant ☐ Fulfillment Center ☐ Other

Who enters Credit Card information into the processing system? ☐ Merchant ☐ Fulfillment Center ☐ Consumer ☐ Other

Do you own the product/inventory? ☐ Yes ☐ No

Is the product stored at your business location? ☐ Yes ☐ No (If No) Where is the product stored?

Who ships the product? ☐ Merchant ☐ Fulfillment Center, Name: Phone #:

After charge authorization, how long until product ships? ____ Days

Product shipped by: ☐ US Mail ☐ Other: Delivery receipt requested? ☐ Yes ☐ No

**Site Inspection**

Merchant: ☐ Owns ☒ Rents Building Type: ☐ Shopping Center ☒ Office Building ☐ Industrial Building ☐ Residence

Area Zoned: ☐ Commercial ☐ Industrial ☐ Residential Square Footage: ☐ 0-500 ☐ 501-2500 ☒ 2501-5000 ☐ 5001-10000+

Based upon your review, does the merchant have the appropriate facilities, equipment, inventory, personnel and license or permit to operate their business? ☐ No ☒ Yes

Comments:

* By Signing below, Inspector is certifying he/she has visited the location and information provided is true and correct.

Inspector Name: Shelley Yarat Inspection Date: 9/18/07 Signature: [signature]

Initials: [initials]

POS CARD SYSTEMS

POS Card Systems
2345 Spring Street
Redwood City CA 94063
Tel (800) 500-3902
Fax (800) 390-8936

# Merchant Application and Agreement

Merrick Bank
101 Crossways Park West Woodbury, NY 11797
Merchant Services Division - Tel (800) 267-2256

Sales Rep. Name: Shelby Palms

Merchant #: ______

Date: ______

MCC: ______

Merchant Name (DBA or Trade Name): VIVE SOL

Corporate/Legal Name (if different):

Location Address: 2020 W. EL CAMINO REAL

Corporate Address (if different):

City: MOUNTAIN VIEW, State: CA Zip: 94040

City: State: Zip:

Contact Name: HELENA & HECTOR

Federal Tax ID:

Email Address:

Phone Number:

Fax Number:

Customer Service Phone Number: 650 938 2020

Merchant name to appear on consumer statement: ☒ DBA Name ☐ Legal Name ☐ Other:

Merchant billing address: ☐ DBA Address ☐ Legal Address ☒ Other: 408 CALIFORNIA AVE, PALO ALTO, CA 94306

Does this location currently take Visa/MasterCard? ☐ No ☒ Yes

If Yes, please provide reason for leaving current processor: LOWER FEES

Have Merchant or Owners/Principals ever been terminated from accepting Bankcards for this business or any other business? ☒ No ☐ Yes

If Yes, please explain reason for termination:

PRINCIPAL/OWNER INFORMATION (70)

Name: HECTOR SOL

Date of Birth:

Address:

Social Security #:

City: State: CA Zip Code: How Long?

Home Phone #:

Drivers License #:

PRINCIPAL/OWNER INFORMATION

Name:

Date of Birth:

Address:

Social Security #:

City: State: Zip Code: How Long?

Home Phone #:

Drivers License #:

Have Merchant or Owners/Principals ever filed business bankruptcy and/or personal bankruptcy? ☒ No ☐ Yes

If Yes, Please provide explanation.

**TYPE OF BUSINESS**

☒ Individual/Sole Proprietor ☐ Partnership ☐ Corporation
☐ Non-Profit ☐ LLC State: ____ ☐ Private
☐ Publicly Traded ☐ Government

Stock Symbol:

Length of time in business: 6 Years ____ Months

Product or Service offered: RESTAURANT

**NATURE OF BUSINESS - 1 or More boxes can be checked**

☐ Retail ☐ Retail w/Tip ☒ Restaurant ☐ MOTO ☐ Internet
☐ Fast Food ☐ Public Sector ☐ Convenience ☐ CSR ☐ Lodging
☐ Petroleum ☐ Utility ☐ Recurring Billing ☐ Other: ______
☐ Seasonal (If seasonal please mark the months the merchant is active)
☐ Jan ☐ Feb ☐ Mar ☐ Apr ☐ May ☐ June
☐ July ☐ Aug ☐ Sept ☐ Oct ☐ Nov ☐ Dec

Monthly Visa/MasterCard Volume: $ ______ Average Ticket: $ ______ High Ticket: $ ______

Refund Policy: NONE

METHOD OF ACCEPTANCE (Totals to Equal 100%) * Merchants Processing Less Than 75% Swipe Transactions must complete the MOTO Questionnaire

Swiped: 95% Key Entered: 5 % MO/TO: ___% Internet: ___% (URL: ______)

Do you use an Independent Service that stores, maintains or transmits Cardholder information: ☒ No ☐ Yes

If Yes please provide Name: ______ Phone Number: ______

**BANK ACCOUNT INFORMATION**

☐ Checking ☐ Savings Bank Name: ______ Contact: ______

Phone #: ______ Transit #(ABA Routing): ______ Account #(DDA): ______

**SCHEDULE A Visa/MasterCard Discount Rates & Fees**

| Tiered Credit: | DISCOUNT | TRANSACTION | | |
|---|---|---|---|---|
| Qualified Rate | % | $ | Chargeback Fee | $ 15.00 |
| Mid Qualified Rate | % | $ | Voice Authorization Fee | $ 0.95 |
| Non-Qualified Rate | % | $ | Monthly Customer Service Fee | $ 5.00 |
| Interchange (Cost) Plus: | 22 % | $ .12 | Monthly Minimum | $ |
| Pin Based Debit | % | $ | Other | $ |
| American Express Rate | % | | Annual Fee | NONE |
| EBT | | $ | Application Fee | $ |
| | | | Non-Bankcard Per Item Fee | $ |

You have the option of accepting MasterCard credit cards, Visa credit cards, MasterCard signature debit cards (MasterMoney Cards) or Visa Signature debit cards (Check Cards). You may elect to accept any or all of these card types for payment. If you do not specifically indicate otherwise, your application will be processed to accept all MasterCard and Visa card types. Elected Visa or MasterCard card types NOT to accept:

Initials:

## MERCHANT APPLICATION AND AGREEMENT ACCEPTANCE

By executing this Merchant Application on behalf of the merchant described above ("Merchant"), the undersigned individual(s) represent(s), warrant(s), and [illegible] If the Merchant is a corporation, limited liability company, or partnership, the individual(s) executing this Application have the requisite legal power and authority to complete and submit this Application on behalf of the Merchant and to make and provide the acknowledgements, authorizations and agreements set forth herein on behalf of the Merchant and individually; (iii) The information contained in this Application is provided for the purpose of [illegible] for the Merchant with the Sponsor Bank ("BANK") and BANK shall rely on the information provided herein in its approval process and in setting the applicable [illegible] BANK is authorized to investigate, either through its own agents or through credit bureaus/agencies, the credit of the Merchant and each person listed on this Application; (v) BANK will determine all rates, fees and charges and notify Merchant of the approved fees and by Merchant's submission and acceptance of Merchant's first settled transaction, Merchant agrees to pay such approved fees; (vi) The Merchant [illegible] received, read, understood, the Merchant Agreement, which is incorporated herein by reference thereto, and agrees on behalf of the merchant to be bound by the terms of such Merchant Agreement. The merchant on whose behalf this Application is being submitted acknowledges that if this Application is being submitted to Merrick Bank as the Sponsor Bank, POS Card Systems ("ISO") shall also be a party to this Merchant Agreement [illegible] ("ISO") shall rely on the representations and warranties set forth in this Application for Merchant Agreement and unless otherwise specified or prohibited by Association [illegible] the rights of BANK under this Application and Agreement

| MERCHANT | BANK |
|---|---|
| Principal #1: [signature] Date: [illegible] | [blank] Date: |
| Print Name: HECTOR SOL | Print Name: |
| Principal #2: Date: | **ISO** |
| Print Name: | BY: Date: |
| | Print Name: |

## CONTINUING PERSONAL GUARANTY PROVISION - PERSONAL GUARANTOR

*By signing below, each individual or entity ("Guarantor") jointly and severally (if there is more than one Guarantor)* and unconditionally guarantees to ISO and BANK the prompt payment and full and complete performance of all obligations of the Merchant identified above under the Merchant Agreement, as amended from time to time, including, without limitation, [illegible] without limitation, charges, interest, costs and other expenses, such as attorney's fees and court costs. This means, among other things, that ISO or BANK can demand performance or payment from any Guarantor if the Merchant fails to perform any obligation or pay what the Merchant owes under the Agreement. Each Guarantor agrees that his or her liability under this guaranty will not be limited or canceled because: (1) the Merchant Agreement cannot be enforced against the Merchant for any reason, including, without limitation, bankruptcy proceedings; (2) either ISO or BANK agrees to changes or modifications to the Merchant Agreement, with or without [illegible] (4) any law, regulation, or order of any public authority affects the rights of either ISO, Merchant, or BANK under the Merchant Agreement; and/or (5) anything else happens that may affect the rights of either ISO or BANK against the Merchant or any other Guarantor. Each Guarantor further agrees that: (a) ISO and BANK each may delay enforcing any of its rights under this guaranty without losing such rights [illegible] each Guarantor without first seeking payment from the Merchant or any other Guarantor or from any security held by the BANK; and (c) such Guarantor will pay all [illegible] and collection costs incurred by either ISO or the BANK in connection with the enforcement of the Merchant Agreement or this Guaranty, whether or not there is a lawsuit, and such additional fees and costs as may be directed by a court. If the Merchant is a corporation or limited liability company, this Guaranty must be executed by a principal or affiliate of Merchant.

| | |
|---|---|
| Principal #1: [signature] Date: [illegible] | Principal #2: Date: |
| Print Name: HECTOR SOL | Print Name: |

## Bank Disclosure - all merchants regardless of type of business must sign Bank Disclosure

Merchant information [illegible] Application

*Important Merchant Responsibilities:*

1. Ensure compliance with cardholder data security and storage requirements.
2. Review and understand the terms of the Merchant Agreement.
3. Maintain fraud and chargebacks below thresholds.
4. Comply with Visa Operating Regulations.

*The responsibilities listed above do not supersede terms of the Merchant Agreement and are provided to ensure the Merchant understands some important obligations of each party and that the Visa Member - Merrick Bank - is the ultimate authority should the Merchant have any problems.*

Merchant's Signature: [signature] Date: 9/19/[illegible]

Merrick Bank, [illegible] (800)267-2256

*Important Bank Responsibilities:*

1. Merrick Bank is the only entity approved to extend acceptance of Visa products directly to a merchant.
2. Merrick Bank is responsible for educating Merchants on pertinent Visa Operating Regulations with which Merchants must comply.
3. Merrick Bank is responsible for all funds held in reserve that is derived from settlement.
4. Merrick Bank is responsible for and must provide settlement funds to the Merchant.
5. Merrick Bank must be a principal (signer) to the Merchant Agreement

## American Express

By signing above, I represent that the information I have provided on the application is complete and accurate and I authorize American Express Travel Related Services Company, Inc. ("[illegible]") to verify the information on this Application and to receive and exchange information about me, including, requesting reports from consumer reporting agencies. If I ask American Express whether or not a consumer report was requested, American Express will tell me, and if American Express received a report, American Express will give me the name and address of the agency that furnished it. I understand that upon American Express approval of the business entity indicated above to accept the American Express Card, [illegible] ("Terms and Conditions") will be sent to such business entity along with a Welcome Letter. By accepting the American Express Card for the purchase of goods and/or services I agree to be bound by the Terms and Conditions.

## Submit Checking Account Information where funds are to be deposited

☐ Attach copy of voided check [illegible] Routing and DDA Numbers

Initials: [initials]

**If the Company is a Corporation the "Corporate Resolution" section below MUST be completed.**

## CORPORATE RESOLUTION

I __________________________, the duly elected, qualified and acting ____________ of _____________________________, a
Corporate Secretary — Office Title — Legal Corporate Name of Co.

________________________ (the "Company"), do hereby certify as follows:
Incorporation Status

The following resolutions were duly adopted by the board of directors/managing member(s)/general partners (circle one) of the Company: WHEREAS, the Company desires to enter into a Merchant Agreement (the "Merchant Agreement") with Merrick Bank Corporation, a Utah industrial loan corporation ("Bank") and ISO, a State and Incorporation Status company ("ISO"), a copy of which Merchant Agreement is attached hereto as Exhibit "A"; WHEREAS, pursuant to the terms of the Merchant Agreement, Bank and ISO will provide certain credit card financing and processing for VISA and/or MASTERCARD credit card purchases made by the Company's customers; WHEREAS, pursuant to the terms of the Merchant Agreement, (a) the Company may be required to establish a Reserve Account (as defined in the Merchant Agreement) and (b) Bank may require the Company to direct certain funds relating to credit card purchases to such Reserve Account; WHEREAS, pursuant to the terms of the Merchant Agreement, Bank may require the Company to execute instruments evidencing Bank's security interest in the Operating Account (as defined in the Merchant Agreement) and Reserve Account; and WHEREAS, pursuant to the terms of the Merchant Agreement, *the Company is required to comply with strict requirements* concerning the processing of credit card transactions and the sale of the Company's products. NOW, THEREFORE, BE IT RESOLVED, that the Merchant Agreement by and among the Company, Bank and ISO, pursuant to which Bank and ISO shall act as the Company's exclusive provider of VISA and/or MASTERCARD credit card financing and processing services, is hereby approved and adopted in the form attached to those resolutions, together with such additions, changes or modifications as may be deemed necessary, advisable or appropriate by the officer(s) executing or causing the same to be completed; and RESOLVED *FURTHER, that in connection with the Merchant Agreement,* the appropriate officer(s) of the Company is/are hereby authorized to establish (a) an Operating Account into which funds from credit card sales by the Company will be directed, and (b) if necessary, a Reserve Account into which funds from credit card sales by the Company may be directed by Bank in accordance with the provisions of the Merchant Agreement; RESOLVED FURTHER, that the Company hereby grants Bank a security interest in the funds held by the Company in the Operating Account and Reserve Account, and the appropriate officer(s) of the Company is/are hereby authorized to execute all documents reasonably required by Bank to perfect such security interests; RESOLVED FURTHER, that the appropriate officer(s) of the Company is/are hereby authorized to enter into such additional agreements, and take such additional actions as may be reasonably required by Bank or ISO in connection with the Merchant Agreement; and RESOLVED FURTHER, that the Secretary / Managing member / general partner (circle one) of the Company is hereby authorized to deliver to Bank and ISO a Certificate (i) identifying the officers of the Company, (ii) verifying the signatures of such officers, and (iii) certifying a copy of these resolutions, and Bank and ISO are hereby authorized to rely on such Certificate until formally advised by a like certificate of any changes therein, and is hereby authorized to rely on any such additional certificates. 2 Each person listed below (an "Officer") (i) holds the office in the Company indicated opposite his or her name on the date hereof, (ii) the signature appearing opposite his or her name is the genuine *signature of each such officer, (iii) each such Officer, acting individually, is* authorized to execute and deliver the Merchant Agreement and each of the agreements and documents contemplated by the Merchant Agreement (collectively, the "Transaction Documents") on behalf of the Company, and (iv) each such Officer, acting individually, is authorized to perform the Company's obligations under the Transaction Documents on behalf of the Company:

Name: ______________ Officer: ______________ Signature: ______________ ←

Name: ______________ Officer: ______________ Signature: ______________ ←

IN WITNESS WHEREOF, I have executed this Certificate this ________ day of ______________ 20___

→ Signature ________________________ Title: ____________________

Print Name: ________________________

## TERMS AND CONDITIONS

In consideration of the mutual covenants herein, Bank, ISO and Merchant agreed as follows:

### ARTICLE I - DEFINITIONS

1.01 "Account" means a demand deposit account (DDA) maintained by Merchant as set forth in Section 3.16 for the crediting of collected funds and the debiting of fees and charges pursuant to the terms of this Agreement.
1.02 "ACH" means the Automated Clearing House paperless entry system controlled by the Federal Reserve.
1.03 "Agreement" means these terms and conditions and any supplementary documents indicated herein.
1.04 "Authorization" means a computerized function or a direct phone call to a designated number to examine individual Transactions to obtain approval from the Card Issuer to charge the Card for the amount of the sale.
1.05 "Card" means (i) a valid credit card in the form issued under license from Visa U.S.A., Inc. Visa International, Inc. or MasterCard International, Inc. ("Bank Card"); or (ii) any other valid credit card accepted by Merchant by agreement with Bank and ISO.
1.06 "Card Association" means Visa U.S.A., Inc., Visa International, Inc., MasterCard International, Inc. or any other Card Issuers that provide Cards that are accepted by Merchant by agreement with Bank and ISO.
1.07 "Card Issuer" means the financial institution or company, which has provided a Card to a Cardholder.
1.08 "Card Not Present (CNP)" means that an imprint of the Card is not obtained at the point-of-sale.
1.09 "Cardholder" means the person whose name is embossed upon the face of the Card.
1.10 "Chargeback" means the procedure by which a Sales Draft (or disputed portion thereof) is returned to Bank by a Card Issuer because such item does not comply with the applicable Card plan's operating regulations.
1.11 "Credit Voucher" means a document executed by a Merchant evidencing any refund or price adjustment relating to Cards to be credited to a Cardholder account.
1.12 "Imprint" means (i) an impression on a Sales Draft manually obtained from a Card through the use of an imprinter, or (ii) the electronic equivalent obtained by swiping a Card through a terminal and electronically capturing Card Data and printing a Sales Draft.
1.13 "Mid or Non-Qualifying Transaction" means any sale Transaction that fails to qualify for lowest interchange rate assigned by the applicable Card Association for the standard card industry code of Merchant and which may be charged fees as set forth in Schedule A.
1.14 "Sales Draft" means the paper form, whether electronically or manually imprinted, evidencing a sale Transaction.
1.15 "Transaction" means any sale of products or services, or credit for such, from a Merchant for which the customer makes payment through the use of any Card and which is presented to Bank for collection.
1.16 "Voice Authorization" means a direct phone call to a designated number to obtain credit approval on a Transaction from the Card Issuer, whether by voice or voice-activated systems.

### ARTICLE II - CARD ACCEPTANCE

2.01 Honoring Cards
Merchant will accept all valid Cards when properly presented by Cardholders in payment for goods or services, subject to Visa rules requiring Merchant to elect whether it will accept credit only, debit only or both debit and credit Cards. Merchant's election is set forth in the Application. (b) Merchant shall not establish minimum or maximum amounts for Card sales as a condition for accepting any Card. (c) Merchant shall not require any Cardholder to pay as a surcharge any part of any discount or charge imposed upon Merchant by this Agreement, whether through any increase in price or otherwise require a customer presenting a Card to pay any charge or price as a condition of sale that is not also required from a customer paying cash. However, Merchant may not, by this term, be prevented from offering discounts to customers for cash purchases. (d) Merchant shall not engage in a Card Transaction (other than a mail order, telephone order, ecommerce or preauthorized sale to the extent permitted under this Agreement) if the person seeking to charge the purchase to his or her Card account does not present the Card to permit Merchant to compare the signature on the Card to the signature on the Sales Draft and obtain an Imprint or otherwise use the physical Card to complete the Transaction.
2.02 Advertising
(a) Merchant agrees to prominently display the promotional materials provided by Bank and ISO in its place(s) of business. Use of promotional materials and use of any trade name, trademark, service mark, or logotype ("Marks") associated with Card(s) shall be limited to informing the public that Card(s) will be accepted at Merchant's place(s) of business. Merchant's use of promotional materials and Marks is subject to the direction of Bank and ISO. (b) Merchant may use promotional materials and Marks during the term of this Agreement and shall immediately cease use and return any inventory to Bank or ISO upon any termination thereof. (c) Merchant shall not use any promotional materials or Marks associated with Visa or MasterCard in any way which suggests or implies that either endorses any goods or services other than Bank Card services.
2.03 Card Acceptance When accepting a Card, Merchant will follow the steps provided by Bank and ISO for accepting Cards and will: (a) Determine in good faith and to the best of its ability that the Card is valid on its face; (b) Obtain Authorization from the Card Issuer to charge the Cardholder's account; (c) Unless the Sales Draft is electronically generated or is the result of a mail, phone, e-commerce or preauthorized order, (i) obtain an Imprint of the Card including embossed data from the merchant imprinter plate; and (ii) obtain the Cardholder's signature on the Sales Draft and compare this signature to the signature on the Card; (d) Enter a description of the goods or services sold and the price thereof (including any applicable taxes); (e) Deliver a true and completed copy of the Sales Draft to the Cardholder at the time of delivery of the goods or performance of the services, or, if the Sales Draft is prepared by a point-of-sale terminal, at the time of the sale; (f) Offer the Sales Draft to Bank for purchase according to Bank's procedures and the terms of this Agreement; and (g) Make an Imprint of the Card, if the Transaction is not

Initials: ________ ________

[illegible] Merchant will employ the use of fraud identification tools as required by Bank and ISO, including but not limited to, [illegible] and CVV2 processing, and acknowledges that use of such tools may prevent Merchant from accepting as payment certain Cards. Merchant will not circumvent fraud identification tools whose usage is mandated by Bank and ISO. [illegible] and that any transaction consummated by Merchant may ultimately result in a Chargeback, for which Merchant retains full liability pursuant to this Agreement.

**2.01 Authorization**

[illegible] Authorization through the use of a terminal, Merchant will request a Voice Authorization from Bank's designated authorization center and will legibly print the authorization number on the Sales Draft. (b) Merchant shall not obtain or attempt to obtain authorization from Bank's authorization center unless Merchant intends to submit to Bank a Transaction for the authorized amount if Authorization for the Transaction is given. (c) Merchant may not divide a single Transaction between two or more Sales Drafts on a single Card to avoid Authorization limits that may be set by the Card Issuer. (d) Merchant acknowledges that an Authorization provides only that the Cardholder account has [illegible] the Transaction will not be subject to dispute or Chargeback or (e) does not warranty the identity of the Cardholder. (e) Merchant shall not attempt to obtain an authorization by successively decreasing the sale amount. (f) Bank or ISO reserves the right to refuse to purchase or process any Sales Draft presented by Merchant (i) unless a proper [illegible] Draft is or is likely to become uncollectible from the Cardholder to which the transaction would otherwise be charged, or (ii) if Bank or ISO has reason to believe that the Sales Draft was prepared in violation of any provision of this Agreement.

**2.02 [illegible]**

(a) Merchant shall use its best efforts, by reasonable and peaceful means, to retain or recover a Card (i) when receiving such instructions when making a request for Authorization or (ii) if Merchant has reasonable grounds to believe the Card is counterfeit, fraudulent or stolen. (b) The obligation of Merchant imposed by this section to retain or recover a Card does not authorize a breach of the peace or any injury to persons or property, and Merchant will hold Bank and ISO harmless from any claim arising from any injury to person or property or other breach of the peace in connection with the retention or recovery of a Card.

**2.03** [illegible] Cardholders to provide any personal information as a condition for honoring Cards unless such information is required to provide delivery of goods or services or Merchant has reason to believe the identity of the person presenting the Card may be different than that of the Cardholder.

**2.04** [illegible] Draft for a single sale or for a single item but shall include all items of goods and services purchased in a single Transaction in the total amount on a single Sales Draft except under the following circumstances: (i) For purchases in separate departments of a multiple department store, (ii) For partial payment, installment payment, delayed delivery or an advance deposit, or (iii) For delayed or amended charges governed by [illegible] rental and [illegible] transactions.

**2.05 Telephone Orders, Mail Orders, Internet/E-Commerce Orders, Preauthorized Orders and Installment Orders**

(a) Unless Merchant has been approved by Bank to accept mail, phone or Internet/e-commerce orders, Merchant warrants that it is a walk-in trade business, located in a retail business place where the public moves in and out freely in order to purchase merchandise or obtain services. If Merchant is found to be accepting Card Transactions [illegible] Internet, or other means that does not create a Sales Draft that bears the Card imprint and Cardholder's signature, this Agreement may be immediately terminated by Bank and/or ISO and the value of all Sales Drafts collected from the first day of processing may be charged back to Merchant and all funds therefrom shall be held pursuant to Section 4.[illegible] Unless approved by Bank, [illegible] sales accepted by telephone, mail, or internet/e-commerce, even through pre-authorized orders. If an [illegible] Card Transaction is made by mail, phone or preauthorized order, the Sales Draft may be completed without the [illegible] Merchant shall write on the Sales Draft the remaining Cardholder data, an Authorization number, the sale amount and the letters "MO", "TO" or "PO", as appropriate. Receiving an Authorization shall not relieve the Merchant of liability for Chargeback on any Transaction. With respect to any Card Transaction that is performed by means of mail, phone, and/or internet/e-commerce order, Merchant [illegible] comply with all terms of the Card Associations' regulations as may be modified from time to time. (c) No delay or failure to assert any claim or exercise any right by Bank and/or ISO, including any claim or right to terminate the [illegible] for violation of this section, shall constitute a waiver of any claim or otherwise abridge any right of Bank and/or ISO to enforce this Agreement [illegible]

**2.09 Lodging and Vehicle Rental Transactions**

(a) Merchant must estimate and obtain Authorization for the amount of the Transaction based upon the Cardholder's [illegible] rental. Additional Authorization must be obtained and recorded for charges actually incurred in excess of the estimated amount. (b) Regardless of the terms and conditions of any written preauthorization form, the Sales Draft amount for any lodging or vehicle rental Transaction shall include only that portion of the sale, including any applicable taxes, evidencing a bona fide rental of real or personal property by Merchant to [illegible] Merchant from enforcing the terms and conditions of its preauthorization form through means other than a Card Transaction.

**2.10 Returns and Adjustments; Credit Vouchers**

(a) Merchant's policy [illegible] established and posted in accordance with operating regulations of the applicable Card Association's regulations. Merchant agrees to disclose, if applicable, to a Cardholder before a Card sale is made, that if merchandise is returned: (i) no refund, or less than a full refund, will be given; (ii) returned merchandise will only be exchanged for similar merchandise of comparable value; (iii) only a credit toward purchases will be given; or [illegible] conditions or circumstances apply to the sale (e.g., late delivery, delivery charges, or other non-credit terms). (b) If Merchant does not make these disclosures, a full refund in the form of a credit to the cardholder's Card account must [illegible] close proximity to the space provided for the Cardholder's signature or on an invoice issued at the time of the sale or on an invoice being presented for the Cardholder's signature. (c) Any change in Merchant's return or cancellation policy must be submitted in writing to Bank and ISO not less than fourteen (14) days prior to the change. Bank may [illegible] which Bank and ISO have not been notified as required herein. Merchant is only permitted to issue credit/refunds to the cardholder's same Card account number used to process the original Sales Draft, in an amount equal to or less than the original Sales Draft amount. Bank and ISO reserve the right to refuse to process credit/refund transactions to cardholder's Card account in cases where Merchant [illegible] available to Bank for the issuance of such credit/refunds or in cases where the Bank or ISO have reason to believe that the issuance of said credit/refunds is the result of fraudulent behavior on the part of the Merchant.

**2.11** [illegible] from a Cardholder for charges included in any Transaction resulting from the use of any Card nor receive any payment from a Cardholder to prepare and present a Transaction for the purpose of effecting a deposit to the Cardholder's Card account.

**2.12 Cash Advances; Scrip Purchases** Merchant shall not deposit any Transaction for the purpose of obtaining or providing a cash advance [illegible] Merchant agrees that either such action shall be grounds for immediate termination.

**2.13 Duplicate Transactions** Merchant shall not deposit duplicate Transactions. Merchant shall be debited for [illegible] duplicate Transactions and shall be liable for any Chargebacks which may result therefrom.

**2.14 Deposits of Fraudulent Transactions** Merchant shall not accept or deposit any [illegible] may not under any circumstances present for processing or credit, directly or indirectly, a Transaction which originated with any other merchant or any other source other than Transactions arising from bona fide purchases from [illegible] Merchant, this Agreement. If Merchant deposits any prohibited Transaction, Merchant may be immediately terminated, and Bank may hold [illegible] demand an Escrow pursuant to Sections 4.02 and 5.05; further, Merchant may be subject to the Visa and MasterCard [illegible] for employees' action, whether negligent or fraudulent, while in its employ.

**2.15 Collection of Pre-existing Debt** Merchant shall not prepare and present to Bank for purchase any Transaction representing the refinancing of an existing obligation of a Cardholder including, but not limited to, obligations (i) previously owed to Merchant, (ii) [illegible] (iii) representing the collection of any other pre-existing indebtedness, including collection of delinquent accounts on behalf of third parties.

**2.16 Release of Cardholder Account Information** Merchant will not, under any circumstances, release, sell or otherwise disclose any Cardholder's account number or any information relating to any Cardholder's account number or any Sales Drafts or Credit Vouchers which may have been imprinted with any Card to any person other than Bank, ISO or the applicable Card Association and, except as expressly authorized in writing by the Cardholder, [illegible] in a secure manner or destroy such information at the proper time in a fashion which renders the data unreadable. Merchant agrees to also notify Bank and ISO of any existing third party involved in the payment process that may have access to cardholder data and obtain approval from the Bank and ISO prior to entering into any third party arrangement whereby such third party [illegible]

**2.17 Compliance with Card Association Rules** Merchant shall comply with and conduct its Card activities in accordance with all applicable Card Association rules and regulations. Failure to comply with such rules and regulations may result in Merchant being terminated for cause and listed on various Card Association and industry databases, including the Terminated Merchant File and the Member Alert to Control High Risk Merchants (MATCH). With respect to MasterCard or Visa USA, Merchant shall not (i) accept cardholder payments for previous Card charges incurred at the Merchant location; (ii) establish a minimum or maximum transaction amount as a condition for honoring [illegible] (iii) require that [illegible] the cardholder's account number, card expiration date, signature, or any other card account data in plain view when mailed; (iv) add any surcharges to transactions; (v) add any tax to transactions, unless applicable law expressly requires that Merchant be permitted to impose a tax (any tax amount, if allowed, must be included in the transaction amount [illegible] previously charged back to Bank and subsequently returned to Merchant, irrespective of cardholder approval (Merchant may pursue payment from the customer outside the Card Association system); (vii) request or use an account number of any purpose other than as payment for its goods or services; (viii) disburse funds in the form of travelers cheques, if the sole purpose is to allow the cardholder to make a cash purchase of goods or services [illegible] (ix) disburse funds in the form of cash, unless Merchant is a Lodging or Cruise Line Merchant disbursing cash to a Cardholder, Merchant is dispensing funds in the form of travelers cheques, Cards, or foreign currency; or Merchant [illegible] a Card for manual cash disbursement; (xi) accept a Card to collect or refinance existing debt that has been deemed uncollectible by the Merchant providing the associated goods or services; or (xii) enter into interchange a Transaction that represents collection of a dishonored check. Merchant shall be liable for payment of all Card Association [illegible] are applicable, at the Bank's and/or ISO's sole discretion, to Merchant's transaction processing or business.

**2.18 Merchant's Business**

(a) Merchant shall provide Bank with immediate notice of its intent to (i) transfer or sell any substantial part of its total assets, or liquidate, (ii) change [illegible] related to its current business, (iii) change ownership or transfer control of its business, (iv) enter into any joint venture, partnership or similar business arrangement whereby any person or entity not a party to this Agreement assumes any interest in Merchant's business, (v) alter in any way Merchant's approved monthly volume, average ticket and/or maximum ticket; or (vi) change its return policies or to another [illegible] those identified in Merchant Application. (b) Merchant shall provide Bank and ISO with prompt written notice if it becomes subject to any voluntary or involuntary bankruptcy or insolvency petition or proceeding. (c) Failure to [illegible] shall be sufficient grounds for termination of Merchant and for exercise by Bank and/or ISO of all their rights and remedies provided by this Agreement. In the event any of the changes listed above should occur, Bank and ISO shall have the option to renegotiate the terms of this Agreement or provide immediate notice of termination. (d) With notice and during Merchant's normal business hours, [illegible] only the part of Merchant's books and records that pertain to the acceptance of Cards and transactions processed.

**2.19 Warranties of Merchant** Merchant hereby provides the following warranties to Bank and ISO: (a) All information contained in Merchant's application for processing services or any other documents delivered to Bank and/or ISO in connection therewith is true and complete and properly reflects the business, financial condition and principal partners, owners or officers. (b) Merchant has the power to execute, deliver and perform this Agreement, and this Agreement is duly authorized, and will not violate any provisions of law, or conflict with [illegible] Merchant has all licenses, if any, required to conduct its business and is qualified to do business in every jurisdiction where it is required to do so. (c) There is no action, suit or proceeding at law or in equity now pending or to Merchant's knowledge, threatened by or against or affecting Merchant which would substantially impair its right to carry on its business as now conducted or adversely affect [illegible] result of any fraudulent or prohibited Transaction or a card being deposited on behalf of any business other than Merchant as authorized by this Agreement. Further, Merchant warrants that each Sales Draft is the result of a bona fide Card Transaction for the purchase of goods or services from Merchant by the Cardholder in the total amount stated on the Sales Draft [illegible] connection with the Card Transaction evidenced thereby. (h) Merchant has complied with Bank's procedures for accepting Cards, and the Card Transaction itself shall not involve any element of credit for any other purposes other than as set forth in this Agreement, and shall not be subject to any defense, dispute, offset or counterclaim which may be raised by any Cardholder under the Card Associations' rules, the Consumer Credit Protection Act (15 USC 1601) or other relevant state or federal statutes or regulations. (i) Merchant warrants that any Credit Voucher which it issues represents a bona fide refund or adjustment on a Card sale by Merchant with respect to which a Sales Draft [illegible]

**ARTICLE III - PRESENTMENT, PAYMENT, CHARGEBACK**

**3.01 Acceptance** Bank shall accept from Merchant all Sales Drafts deposited by Merchant under the terms of this [illegible] for collection against Cardholder accounts. Merchant is required to transmit Sales Drafts and Credit Vouchers to Bank or its processing vendor on the same or next business day immediately following the day that such Sales Drafts and Credit Vouchers have been originated. All [illegible] and assignments of Sales Drafts, collection therefore and re-assignment or rejection of such Sales Drafts [illegible] credit the value of collected Sales Drafts to Merchant's Account and reserves the right to adjust amounts collected to reflect the value of Chargebacks (actual and anticipated), fees, penalties, late submission charges, Reserve deposits, negative Sales Draft batch deposits and items for which Bank did not receive final payment.

**3.02 Endorsement** The presentment of Sales Drafts [illegible] to sell and assign all its right, title and interest in each Sales Draft completed in conformity with Bank's acceptance procedures and shall constitute an endorsement by Merchant to Bank of such Sales Drafts. Merchant hereby authorizes [illegible] on Merchant's behalf.

**3.03 Prohibited Payments** Bank shall have the sole right to receive payment of any Sales Drafts presented by Merchant and paid by Bank unless and until there is a Chargeback. Unless specifically authorized in writing by Bank, Merchant shall not make or attempt to make any collections on any Sales Draft, including Chargebacks, and [illegible] in part, of the amount of any accepted Transaction, together with the Cardholder's name and account number and any correspondence accompanying the payment.

**3.04 Chargebacks**

(a) Merchant agrees to accept for chargeback any [illegible] rule according to prevailing Card Association regulations. (b) An Issuer or Bank determines that Merchant has in any way failed to comply with Card Association regulations or Bank's procedures in accepting a Card and processing [illegible] notwithstanding, Merchant acknowledges that Bank shall have full recourse to charge back the amount of a Card sale for which the Cardholder disputes the validity

Initials: [illegible]

[illegible]

authorized the charge if (i) the imprint of the Card or (ii) the signature of the Cardholder was not obtained by Merchant. (e) Merchant shall not initiate a sale Transaction in an attempt to collect a Chargeback. (f) Merchant agrees to pay the current published fees for each Chargeback as listed on Schedule A.

## ARTICLE IV - TERMINATION AND EFFECT OF TERMINATION

4.01 Term; Termination

(a) This Agreement shall become effective upon acceptance by Bank and shall continue for a period of two (2) years with automatic one-year renewals thereafter until any party has provided written notice of non-renewal given no less than thirty (30) days from the end of the then-current term. Bank or ISO may terminate this Agreement immediately without prior notice if (i) either party has reason to believe that fraudulent Card Transactions or other activity prohibited by this Agreement is occurring at any Merchant location; (ii) such action is taken to prevent loss to Bank, ISO or Card Issuers; or (iii) the name of Merchant or any principal person associated with the Merchant, or events appears on any Card Association's security reporting list. Notwithstanding the foregoing, this Agreement may be [illegible]

terms of this Agreement, including, without limitation, those relating to the discount rate or to other fees and charges payable by Merchant by notifying Merchant of the amendment pursuant to the notice provisions of Section 5.13 and such amendment shall become effective immediately. If Merchant does not desire to be bound by any such new amendments to this Agreement, Merchant shall notify Bank and ISO within five (5) calendar days of its election to terminate this Agreement. If Merchant fails to make such notice during the time allotted, termination of this Agreement shall be governed pursuant to Section 4.01 of this Agreement.

5.09 ISO MAKES NO WARRANTIES REGARDING THE USE, OPERATION OR PERFORMANCE OR NON-PERFORMANCE OF SOFTWARE AND SYSTEMS UTILIZED FOR THIS AGREEMENT, WHETHER EXPRESS OR IMPLIED, AND ISO EXPRESSLY DISCLAIMS ALL IMPLIED WARRANTIES, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

5.10 Supplementary Documents. References to "this Agreement" include any valid schedules, appendices and amendments thereto.

**VIVE SOL**
2020 W. EL CAMINO REAL
MOUNTAIN VIEW, CA 94040
(650) 938-2020

3413
90-78/1211

DATE Void

PAY TO THE ORDER OF Void $ Void

DOLLARS

BANK of the WEST
Palo Alto Office
410 CALIFORNIA AVE.
PALO ALTO, CA 94306
1-800-[illegible]

FOR Void

⑈003413⑈ ⑆121100782⑆

[illegible] Merchant [illegible] Agreement [illegible] expressly acknowledges and agrees that the [illegible] Merchant's [illegible] Records. Following termination of this Agreement [illegible] Merchant shall [illegible] all original and electronic copies of all Sales Drafts and Credit Vouchers that have been [illegible] Merchant's processing activities [illegible] this Agreement.

## ARTICLE V - MISCELLANEOUS

5.01 Account Monitoring. Merchant acknowledges that ISO and/or Bank will monitor Merchant's daily deposit activity. Merchant agrees that Bank may upon reasonable grounds suspend the disbursement of Merchant's funds [illegible] required to investigate suspicious or unusual deposit activity. ISO and/or Bank will make good faith efforts to notify Merchant promptly [illegible] ISO and/or Bank shall have no liability to Merchant for any losses [illegible] Merchant may attribute to any suspension of funds disbursement.

5.02 Forms. Merchant shall use only such forms or modes of transmission for Sales Drafts and Credit Vouchers as are provided or approved in advance by Bank or ISO, and Merchant shall not use forms [illegible] with Card Transactions.

5.03 Records. In addition to any records routinely furnished to Bank or ISO pursuant to this Agreement, Merchant shall preserve a copy of the actual paper Sales Drafts and Credit Vouchers and any written authorization of the Cardholder for at least two (2) years after the date Merchant presents the Transaction to Bank.

5.04 Requests for Copies. Immediately upon receipt of any request by Bank or ISO, Merchant shall provide either the actual paper Sales Draft or a legible copy thereof [illegible] and any other documentation or information reasonably requested by Bank or ISO to meet Bank's obligations under the [illegible] Card Association [illegible] Cardholder accounts.

5.05 Compliance with Law. Merchant shall comply with all laws applicable to Merchant, Merchant's business and any Card Transaction, including without limitation all state and federal consumer credit and consumer protection statutes and regulations.

5.06 Fees, Charges and Taxes. Merchant shall pay to Bank the fees and charges set forth on Schedule A and the other pricing disclosures, including any additional charges applied to transactions that fail to meet Card Association requirements for the lowest interchange levels. Merchant's account will be debited through ACH or withheld from daily payments to Merchant for such amounts and for any other fees, charges or adjustments (including chargebacks and collection of Merchant funds to cover [illegible] of credits or refunds) incurred by Merchant and associated with processing services. In the event collection of such amounts, fees, charges or adjustments is unsuccessful through the ACH or from being withheld from daily payments to Merchant, Merchant agrees to allow Bank and ISO to initiate a sales transaction to any credit or debit card(s) provided by Merchant to Bank and ISO. Bank and ISO shall have the right to change fees, including adding fees for additional services utilized by Merchant in accordance with Sections 5.07 and 5.13. In the event Merchant's transaction processing, including but not limited to excessive retrieval transactions or chargebacks, exceeds or violates any Card Association rule and regulation or Bank and/or ISO requirement, Bank and/or ISO may unilaterally undertake one or more of the following measures: (i) Increase or impose a risk reserve and set up and fund a reserve under the Reserve Account, (ii) impose or increase the surcharge, (iii) impose a surcharge to existing Retrieval Request and/or Chargeback fees. Merchant acknowledges that it is familiar with Card Association rules and regulations, and that though Bank and ISO may notify Merchant of any changes to Card Association rules and regulations, it is under no obligation to do so, and [illegible] fee.

5.07 Security. Merchant agrees that all of its obligations under this Agreement shall be secured to Bank and ISO by all deposit accounts maintained by Merchant with Bank, including deposits made by Merchant as collateral or funds withheld by Bank or ISO as the result of another security measure, and by all other personal property that serves as collateral for any other indebtedness arising out of Merchant's business and owed by Merchant to Bank or ISO. Merchant agrees that if Bank determines that the proceeds of Merchant's future Card sales are unlikely to cover anticipated Chargebacks, credits, fees and adjustments, as reasonably determined by Bank or ISO (whether because this Agreement has been terminated or for any other reason), Bank may fully or partially prohibit withdrawal by Merchant of funds from Merchant's deposit accounts maintained with Bank or [illegible] whether than Bank, pending a determination from time to time by Bank and ISO to exercise their respective rights as a secured party against such accounts in partial or full payment of Merchant's obligations to Bank and ISO.

5.08 Modifications to Agreement. This Agreement is subject to amendment to conform with Card Association regulations, as amended from time to time. From time to time Bank and ISO may amend any provision or provi-

party shall be the exclusive and [illegible] located in the state courts located in [illegible] County, [illegible] which case this Agreement shall be governed by and construed under the laws of the State of Utah.

5.15 Entire Agreement; Assignability. This Agreement constitutes the entire understanding of the parties with respect to the subject matter hereof and [illegible] or modified by [illegible] in writing, pursuant to Section 5.07. This Agreement may not be assigned, directly or by operation of law, without the prior written consent of Bank and ISO. This Agreement shall be binding upon and inure to the benefit of the parties' respective heirs, personal representatives, successors and assigns.

5.16 Deposit Account. Merchant shall at all times maintain an Account at a bank that is a member of the Federal Reserve ACH System and shall provide Bank and ISO with proper authorization for debiting of the account. All credits for collected funds shall be made to [illegible] and Chargebacks and other Amounts for which Merchant is liable under the terms of this Agreement, including [illegible] debit entries [illegible] Merchant may not close or change the Account without written notice to Bank or ISO. Merchant will be solely liable for all fees and costs associated with such Account and for all overdrafts. Merchant hereby grants to Bank and ISO a security interest in the Account to the extent of any and all fees, payments and chargebacks and other amounts due which may arise under this Agreement, and Merchant shall execute any document and obtain any consents or waivers from the bank at which the Account is maintained as requested by Bank or ISO to protect their security interests therein. This Agreement [illegible] this Agreement are satisfied.

5.17 Credit and Financial Inquiries; Additional Locations; Inspections.

(a) Merchant authorizes Bank and ISO to make, or any bank, any credit inquiries which it [illegible] necessary to accept or review acceptance of this Agreement or in [illegible] Merchant's deposit or Card acceptance activities subsequent to acceptance of this Agreement. Such inquiries shall include, but are not limited to, a credit and/or criminal check of the business including its proprietor, partners, principal owners or shareholders or officers. Merchant, including any person signing as the Merchant Agreement, authorizes the release to Bank, ISO and/or their designees of any and all information and [illegible] that they request, whether of a personal or business nature. Such information includes, but is not limited to, employment history and current bank, agency reports, and similar account balances, credit history, and copies of Federal and State income tax returns. Bank and ISO may provide this authorization, or any facsimile thereof, to any party named in the Merchant Application and Agreement. If requested to do so by Bank or ISO, Merchant shall provide the written consent of any person for which an inquiry has been or is to be made if such person has not executed this Agreement and will provide any financial statements, income tax and business tax returns and other financial information as Bank or ISO may consider necessary to perform initial or periodic reviews of Merchant's financial stability and business practices. (b) Merchant may accept Cards only at locations approved by Bank. Additional locations may be added, subject to Bank's and ISO's approval. Any party to this Agreement may delete any location by providing notice as provided herein. (c) Merchant agrees to permit Bank or ISO, at any time and from time to time, to inspect locations to confirm that Merchant has or is adhering to the terms of this Agreement and is maintaining the proper facilities, equipment, inventory, records and license or permit (where necessary) to conduct its business. However, nothing in this paragraph shall be deemed to waive Merchant's obligation to comply in all respects with the terms of this Agreement. (d) Representatives of Bank or ISO may, during normal business hours, inspect, audit and make copies of Merchant's books, accounts, records and files pertaining to any Card Transaction.

5.18 Marketing of Non-Bankcard Services by ISO. From time to time, ISO may offer to Merchant certain additional products and services which may or may not be related to the processing of credit card Transactions. In the event of such offers, Merchant shall indicate its desire to ISO to decline such offers or be deemed to have accepted the offers and be liable for payment therefor.

5.19 Exclusivity. During the initial and any renewal term of this Agreement, you will not enter into an agreement with any other entity that provides card or debit card processing services similar to those provided by Bank and ISO as contemplated by this Agreement without Bank's and ISO's written consent.

5.20 Acceptable Use Policy. Bank and ISO have established an acceptable Use Policy (AUP) that governs usage of the Merchant Account by Merchant, as more fully described on the ISO's website [illegible]. which is made part of the Agreement by this reference. In general terms, the AUP prohibits Merchant from using the Merchant Account for illegal activities, as well as for certain prescribed business types and/or for the sale of certain proscribed products or services. Bank and ISO reserve the right to revise or make exceptions to the AUP. Notice of revision to the AUP will be made in accordance with Section 5.13 of this Agreement.

Initials: [signature]

POS CARD SYSTEMS
a division of Vision Eastward, Inc.

To be filled out by POS Card Systems Sales Representative

VIVE SOL

| Fees | Monthly Fee | Per Item/Transaction Fee | Set-up/One-Time Fee |
|---|---|---|---|
| Wireless Service | ~~$20.00~~ | ~~$0.10~~ | |
| Minimum Discount Fee | | | |
| Equipment Rental Fee | | | |
| Maintenance Fee | | | |
| Online Access Fee | | Email Address: | |
| Other Fee | | | |

| Card Type/Service | | Discount Rate | Per Item/Transaction Fee |
|---|---|---|---|
| EBT - Electronic Benefits | | % | $ |
| Check Service | Attach Check Service Application | % | $ |
| Gift Card | Attach Gift Card Application | % | $ |
| SCAN | Attach SCAN Service Application | % | $ |
| Check Imaging | Attach Check Imaging Application | % | $ |
| ACH | Attach ACH Application | % | $ |
| Other | | % | $ |

| Equipment Type | Quantity | | Price/Unit | Sub-Total |
|---|---|---|---|---|
| Terminal Type: Aria ... Vx 570 | 1 | ☐ Customer Owned ☑ Supplied by POS | $ | $ 6 |
| Pin Pad Type: ☐ Internal ☐ External (1 MO. | | ☐ Customer Owned ☐ Supplied by POS | $ | $ |
| Printer Type: 1 ... trial.) | | ☐ Customer Owned ☐ Supplied by POS | $ | $ |
| Check Reader Type: DUE 1470 plus tax | | ☐ Customer Owned ☐ Supplied by POS | $ | $ |
| Card Reader Type: A ... | | ☐ Customer Owned ☐ Supplied by POS | $ | $ |
| Software Type: D D | | ☐ Customer Owned ☐ Supplied by POS | $ | $ |
| - Additional Software Users: for | | | $ | $ |
| Hand Imprinter: Both LOCATIONS | | ☐ Customer Owned ☐ Supplied by POS | $ | $ |
| | | | 8.25% Sales Tax | $ |
| | | | Equipment Sub-Total | $ |

Ship To: ☐ Merchant ☐ Sales Rep ☐ Other | Bill Shipping: ☐ Merchant ☐ Sales Rep

If Other Name:

Address: City: State: Zip:

**INTERNET MERCHANT**

☐ MTREX (☐ Merchant Interface ☐ API) ☐ Authorize.Net ☐ Plug'n Pay ☐ Other: (fill in name)

Monthly Gateway Fee $ Internet Per Transaction Fee $ Recurring Billing $ Setup Fee $

☐ CartManager Monthly Fee: $ Setup Fee $

Merchant URL:

Merchant Email Address:

Internet Sub-Total $

**BILLING/PAYMENT METHOD**

☐ Check payable to POS Card Systems

☐ ACH Merchant Account for Applications, Terminals, and Supplies

TOTAL Payment $ 0

☐ Bill Merchant on Visa/MasterCard ______ Exp: __/__

☐ Bill Merchant $______ for ______ Months

**PROCESSOR**

☑ Vital ☐ Paymentech ☑ Other:

Auto Close: ☐ Yes ☐ No Time: ____ ☐ ... ☐ ... ☐ EST ☐ CST ☐ MST ☐ PST

**TERMINAL PROMPTS**

☐ AVS | ☐ Multi Merchant
☐ CVV2 | ☐ Clerk ☑ Server — 15 SERVERS
☐ Tip Prompts | ☐ Tip Assist
☐ ... | ☐ Dial Phone Prefix ☐ 8 ☐ 9 ☐ Other:____
| IP ☐ Dynamic IP Address ☐ Static IP Address: ____

# EXHIBIT 2

2007-05-21 15:30 BANK OF [redacted] E WEST 6503254386 >> [redacted] 3908936 P 1

POS CARD SYSTEMS
a division of Vision Bankcard, Inc.

# New Merchant Checklist

Date: 5/21/07

Business DBA: PALO Alto Sol

Referral Partner:

**Travel & Entertainment** — Complete Account Number Below

Discover: ☐ New Account Requested

American Express: ☐ New Account Requested

JCB:

**Retail Merchant Required Documentation**

Retail store front, 75% swiped, less than $70,000 per month processing volume or Service business under $25,000 per month processing volume

☐ Merchant Application ☐ Voided Check

☐ Site Inspection ☐ 3 Months Bankcard Statements, current & consecutive (if applicable)

Additional documentation for Retail store front over $70,000 per month processing volume or Service business over $25,000 per month processing volume

☐ Current Business Financials ☐ Two Years Business Tax Returns ☐ Marketing Materials ☐ Two Trade References

☐ Two Months Business Checking Account Statements, current & consecutive (if in business for less than two years)

One of the following: ☐ Non-Profit - Form 501C ☐ Corporation - Articles of Incorporation ☐ Partnership - Partnership Agreement

**Mail Order, Telephone Order, Internet Merchant Required Documentation**

Mail Order, Telephone Order or Internet business, 100% keyed, less than $25,000 per month processing volume

☐ Merchant Application ☐ Voided Check

☐ Site Inspection or Website ☐ 3 Months Bankcard Statements (if applicable)

☐ Refund Policy filled out on contract ☐ Marketing Materials

One of the following: ☐ Non-Profit - Form 501C ☐ Corporation - Articles of Incorporation ☐ Partnership - Partnership Agreement

Additional documentation for Mail Order, Telephone Order or Internet business over $25,000 to $70,000 per month processing volume

☐ Current Business Financials

☐ Two Months Business Checking Account Statements, current & consecutive (if in business for less than two years)

Additional documentation for Mail Order, Telephone Order or Internet business over $70,000 per month processing volume

☐ One Year Business Owners Personal Tax Returns ☐ Two Years Business Tax Returns ☐ Two Trade References

☐ Three Months Business Checking Account Statements, current & consecutive (if in business for less than two years)

**MOTO Questionnaire - REQUIRED if processing less than 75% swipe**

What percentage of sales is to: Business: ____% Individual Consumers: ____%

Method of Marketing: ☐ Newspaper/Magazine ☐ Television/Radio ☐ Internet ☐ Direct Mail, Brochure and/or Catalog ☐ Outbound Telemarketing Sales ☐ Other:

Who Processes the order? ☐ Merchant ☐ Fulfillment Center ☐ Other

Who enters Credit Card information into the processing system? ☐ Merchant ☐ Fulfillment Center ☐ Consumer ☐ Other

Do you own the product/inventory? ☐ Yes ☐ No

Is the product stored at your business location? ☐ Yes ☐ No (If No) Where is the product stored?

Who ships the product? ☐ Merchant ☐ Fulfillment Center; Name: ________ Phone #:

After charge authorization, how long until product ships? ____ Days

Product shipped by: ☐ US Mail ☐ Other: ________ Delivery receipt requested? ☐ Yes ☐ No

**SITE INSPECTION**

Merchant: ☐ Owns ☑ Rents Building Type: ☑ Shopping Center ☐ Office Building ☐ Industrial Building ☐ Residence

Area Zoned: ☑ Commercial ☐ Industrial ☐ Residential Square Footage: ☐ 0-500 ☑ 501-2500 ☐ 2501-5000 ☐ 5001-10000+

Based upon your review, does the merchant have the appropriate facilities, equipment, inventory, personnel and license or permit to operate their business? ☐ No ☑ Yes

Comments:

* By Signing below, Inspector is certifying he/she has visited the location and information provided is true and correct.

Inspector Name: Shelby Palms Inspection Date: 5/21/07 Signature: [signature]

Initials: [initials]

2007-05-21 15:31 BANK OF [redacted] WEST 6503254386 >> [redacted] 3908936 P 2/21

POS CARD SYSTEMS

POS Card Systems
2345 Spring Street
Redwood City CA 94063
Tel (800) 500-3902
Fax (800) 390-8938

a Division of Vision Sonboard, Inc.

# Merchant Application and Agreement

Merrick Bank
101 Crossways Park West Woodbury, NY 11797
Merchant Services Division - Tel (800) 267-2256

Sales Rep. Name: Shelby Palms.
Merchant #
Date: 5/21/07
MCC:

Merchant Name (DBA or Trade Name) PALO Alto Sol
Corporate/Legal Name (if different)
Location Address 408 California Avenue
Corporate Address (if different)
City PALO Alto, CA State Zip 94306
City State Zip
Contact Name: Hector
Federal Tax ID:
Email Address:
Phone Number:
Fax Number:
Customer Service Phone Number 650 328 8840

Merchant name to appear on consumer statement: ☒ DBA Name ☐ Legal Name ☐ Other:
Merchant billing address: ☒ DBA Address ☐ Legal Address ☐ Other:
Does this location currently take Visa/MasterCard? ☐ No ☒ Yes
If Yes, please provide reason for leaving current processor: lower fees
Have Merchant or Owners/Principals ever been terminated from accepting Bankcards for this business or any other business? ☒ No ☐ Yes
If Yes, please explain reason for termination:

100

Name: Hector Sol
Address:
City:
State: CA Zip Code:
How Long?
Home Phone #:
Date of Birth:
Social Security #:
Drivers License #:

Name:
Address:
City: State: Zip Code: How Long?
Home Phone #:
Date of Birth:
Social Security #:
Drivers License #:

Have Merchant or Owners/Principals ever filed business bankruptcy and/or personal bankruptcy? ☐ No ☐ Yes
If Yes, Please provide explanation:

## TYPE OF BUSINESS

☒ Individual/Sole Proprietor ☐ Partnership ☐ Corporation
☒ Non-Profit (Must Provide 501-C) ☐ LLC State: ☐ Private
☐ Publicly Traded ☐ Government
Stock Symbol:
Length of time in business: 15 Years Months
Product or Service offered: Restaurant

## NATURE OF BUSINESS - 1 or More boxes can be checked

☐ Retail ☒ Retail w/Tip ☒ Restaurant ☐ MO/TO ☐ Internet
☐ Fast Food ☐ Public Sector ☐ Convenience ☐ QSR ☐ Lodging
☐ Petroleum ☐ Utility ☐ Recurring Billing ☐ Other
☐ Seasonal: (if seasonal please mark the months the merchant is active)
☐ Jan ☐ Feb ☐ Mar ☐ Apr ☐ May ☐ June
☐ July ☐ Aug ☐ Sept ☐ Oct ☐ Nov ☐ Dec

Monthly Visa/MasterCard Volume: $ 88,000 Average Ticket: $ 40.00 High Ticket: $ 300.00
Refund Policy:

METHOD OF ACCEPTANCE (Totals to Equal 100%)* Merchants Processing Less Than 75% Swipe Transactions must complete the MOTO Questionnaire
Swiped: 98 % Key Entered: 2 % MO/TO: % Internet: % (URL: )
Does Merchant use an independent Service that stores, maintains or transmits Cardholder information: ☐ No ☐ Yes
If Yes, please provide Name: Phone Number:

## BANK ACCOUNT INFORMATION

☐ Checking ☐ Savings Bank Name:
Phone #: Transit #(ABA Routing): Contact:
Account #(DDA):

## SCHEDULE A Visa/MasterCard Discount Rates & Fees

| Tiered Credit | DISCOUNT | TRANSACTION | | |
|---|---|---|---|---|
| Qualified Rate | % | $ | Chargeback Fee | $ 15.00 |
| Mid Qualified Rate | % | $ | Voice Authorization Fee | $ 0.95 |
| Non-Qualified Rate | % | $ | Monthly Customer Service Fee | $ 5.00 |
| Interchange (Cost) Plus: | .22% | $ .12 | Monthly Minimum | $ |
| Pin Based Debit | % | $ | Other | $ |
| American Express Rate | % | | Annual Fee | NONE |
| EBT | | $ | Application Fee | $ |
| | | | Non-Bankcard Per Item Fee | $ |

You have the option of accepting MasterCard credit cards, Visa credit cards, MasterCard signature debit cards (MasterMoney Cards) or Visa Signature debit cards (Check Cards). You may elect to accept any or all of these card types for payment. If you do not specifically indicate otherwise, your application will be processed to accept all MasterCard and Visa card types. Elected Visa or MasterCard card types NOT to accept:

Initials:

## MERCHANT APPLICATION AND AGREEMENT ACCEPTANCE

*By executing this Merchant Application on behalf of the merchant described above ("Merchant"), the undersigned individual(s) represent(s), warrant(s) and* acknowledge(s) that: (i) All information contained in this Merchant Application ("Application") is true, correct and complete as of the date of this Application; (ii) If the Merchant is a corporation, limited liability company, or partnership, the individual(s) executing this Application have the requisite legal power and authority to complete and submit this Application on behalf of the Merchant and to make and provide the acknowledgements, authorizations and agreements set forth herein on behalf of the Merchant and individually; (iii) The information contained in this Application is provided for the purpose of obtaining, or maintaining, a merchant account for the Merchant with the Sponsor Bank ("BANK") and BANK shall rely on the information provided herein in its approval process and in setting the applicable Discount Rate, Approved Average Ticket, and Approved Monthly Bankcard Volume; (iv) BANK is authorized to investigate, either through its own agents or through credit bureaus/agencies, the credit of the Merchant and each person listed on this Application; (v) BANK will determine all rates, fees and charges and notify Merchant of the approved fees and by Merchant's submission and acceptance of Merchant's first settled transaction, Merchant agrees to pay such approved fees; (vi) The Merchant Agreement shall not take effect until Merchant has been approved by BANK and a merchant number has been issued to merchant; and (vii) The undersigned has received, read, understood, the Merchant Agreement, which is incorporated herein by reference thereto, and agrees on behalf of the merchant to be bound by the terms of such Merchant Agreement. The merchant on whose behalf this Application is being submitted acknowledges that if this Application is being submitted to Merrick Bank as the Sponsor Bank, POS Card Systems ("ISO") shall also be a party to this Merchant Agreement. In such case, Merchant acknowledges that POS Card Systems ("ISO") shall rely on the representations and warranties set forth in this Application for Merchant Agreement and unless otherwise specified or prohibited by Association or applicable law, ISO shall have all the rights of BANK under this Application and Agreement

| MERCHANT | BANK |
|---|---|
| Principal #1: [signature] Date: 5/21/07 | BY: ______ Date: ______ |
| Print Name: Hector Sol | Print Name: ______ |
| Principal #2: ______ Date: ______ | **ISO** |
| Print Name: ______ | BY: ______ Date: ______ |
| | Print Name: ______ |

## CONTINUING PERSONAL GUARANTY PROVISION - PERSONAL GUARANTOR

By signing below, each individual or entity ("Guarantor") jointly and severally (if there is more than one Guarantor) and unconditionally guarantees to ISO and BANK the prompt payment and full and complete performance of all obligations of the Merchant identified above under the Merchant Agreement, as amended from time to time, including, without limitation, all promises and covenants of the Merchant, and all amounts payable by the Merchant under the Merchant Agreement, including, without limitation, charges, interest, costs and other expenses, such as attorney's fees and court costs. This means, among other things, that ISO or BANK can demand performance or payment from any Guarantor if the Merchant fails to perform any obligation or pay what the Merchant owes under the Agreement. Each Guarantor agrees that his or her liability under this guaranty will not be limited or canceled because: (1) the Merchant Agreement cannot be enforced against the Merchant for any reason, including, without limitation, bankruptcy proceedings; (2) either ISO or BANK agrees to changes or modifications to the Merchant Agreement, with or without notice to Guarantor; (3) ISO or BANK releases any other Guarantor or the Merchant from any obligation under the Merchant Agreement; (4) any law, regulation, or order of any public authority affects the rights of either ISO, Merchant, or BANK under the Merchant Agreement; and/or (5) anything else happens that may affect the rights of either ISO or BANK against the Merchant or any other Guarantor. Each Guarantor further agrees that: (a) ISO and BANK each may delay enforcing any of its rights under this guaranty without losing such rights and hereby waives any applicable Statute of Limitations; (b) ISO and BANK each can demand payment from each Guarantor without first seeking payment from the Merchant or any other Guarantor or from any security held by the BANK; and (c) such Guarantor will pay all court costs, attorney's fees, and collection costs incurred by either ISO or the BANK in connection with the enforcement of the Merchant Agreement or this Guaranty, whether or not there is a lawsuit, and such additional fees and costs as may be directed by a court. If the Merchant is a corporation or limited liability company, this Guaranty must be executed by a principal or affiliate of Merchant.

| | |
|---|---|
| Principal #1: [signature] Date: 5/21/07 | Principal #2: ______ Date: ______ |
| Print Name: Hector Sol | Print Name: ______ |

## Bank Disclosure - all merchants regardless of type of business must sign Bank Disclosure

Merchant Information: refer to Merchant Application

**Important Merchant Responsibilities:**

1. Ensure compliance with cardholder data security and storage requirements.
2. Review and understand the terms of the Merchant Agreement.
3. Maintain fraud and chargebacks below thresholds.
4. Comply with Visa Operating Regulations.

The responsibilities listed above do not supersede terms of the Merchant Agreement and are provided to ensure the Merchant understands some important obligations of each party and that the Visa Member - Merrick Bank - is the ultimate authority should the Merchant have any problems.

[signature] 5/21/07

Merchant's Signature Date

Merrick Bank, 101 Crossway Park West, Woodbury, NY 11797, Phone (800)267-2256

Important Bank Responsibilities:

1. Merrick Bank is the only entity approved to extend acceptance of Visa products directly to a Merchant.
2. Merrick Bank is responsible for educating Merchants on pertinent Visa Operating Regulations with which Merchants must comply.
3. Merrick Bank is responsible for all funds held in reserve that is derived from settlement.
4. Merrick Bank is responsible for and must provide settlement funds to the Merchant.
5. Merrick Bank must be a principal (signer) to the Merchant Agreement

## American Express

By signing above, I represent that the information I have provided on the application is complete and accurate and I authorize American Express Travel Related Services Company Inc. ("American Express") to verify the information on this Application and to receive and exchange information about me, including, requesting reports from consumer reporting agencies. If I ask American Express whether or not a consumer report was requested, American Express will tell me, and if American Express received a report, American Express will give me the name and address of the agency that furnished it. I understand that upon American Express approval of the business entity indicated above to accept the American Express Card, the terms and conditions for American Express Card Acceptance ("Terms and Conditions") will be sent to such business entity along with a Welcome Letter. By accepting the American Express Card for the purchase of goods and/or services I agree to be bound by the Terms and Conditions.

## Submit Checking Account Information where funds are to be deposited

☐ Attach Copy of Voided Check ☐ Attach copy of Bank Letter with Routing and DDA Numbers

Initials: [initials]

If the Company is a Corporation the "Corporate Resolution" section below MUST be completed.

## CORPORATE RESOLUTION

I, ______________ (Corporate Secretary), the duly elected, qualified and acting ______________ (Office Title) of ______________ (Legal Corporate Name of Co.), a ______________ (Incorporation Status) (the "Company"), do hereby certify as follows:

The following resolutions were duly adopted by the board of directors/managing member(s)/general partners (circle one) of the Company: WHEREAS, the Company desires to enter into a Merchant Agreement (the "Merchant Agreement") with Merrick Bank Corporation, a Utah industrial loan corporation ("Bank") and ISO, a State and Incorporation Status company ("ISO"), a copy of which Merchant Agreement is attached hereto as Exhibit "A"; WHEREAS, pursuant to th[illegible] credit card p[illegible] required to e[illegible] to credit card [illegible] execute instr[illegible] WHEREAS, [illegible] of credit card [illegible] the Compan[illegible] financing an[illegible] modification[illegible] FURTHER, t[illegible] Operating A[illegible] from credit c[illegible] that the Com[illegible] appropriate [illegible] RESOLVED [illegible] additional ac[illegible] Secretary [illegible] ing the office[illegible] authorized t[illegible] ditional cert[illegible] (i) the signat[illegible] [illegible] ...STERCARD [illegible] ay be [illegible] s relating [illegible] pany to [illegible] nt and [illegible] ocessing [illegible] and among [illegible] credit card [illegible] hanges or [illegible] ESOLVED [illegible] an [illegible] h funds [illegible] URTHER, [illegible] nd the [illegible] interests; [illegible] ake such [illegible] it the [illegible] e (i) identify- [illegible] are hereby [illegible] such ad- [illegible] date hereof, [illegible] authorized to execute and deliver the Merchant Agreement and each of the agreements and documents contemplated by the Merchant Agreement (collectively, the "Transaction Documents") on behalf of the Company, and (iv) each such Officer, acting individually, is authorized to perform the Company's obligations under the Transaction Documents on behalf of the Company.

PALO ALTO SOL RESTAURANT
408 CALIFORNIA AVENUE
PALO ALTO, CA 94306
(650) 328-8840

6809
90-78/1211

PAY TO THE ORDER OF ______________ $ ______
DATE ______
______________ DOLLARS

BANK OF THE WEST
Palo Alto Office
444 California Ave
Palo Alto, CA
1-800-[illegible]

FOR ______________

⑆121100782⑆ 06809

Name: ______________ Officer: ______________ Signature: ______________

Name: ______________ Officer: ______________ Signature: ______________

IN WITNESS WHEREOF, I have executed this Certificate this ______ day of ______________, 20____

Signature: ______________ Title: ______________

Print Name: ______________

## TERMS AND CONDITIONS

In consideration of the mutual covenants herein, Bank, ISO and Merchant agree as follows:

### ARTICLE I - DEFINITIONS

1.01 "Account" means a demand deposit account (DDA) maintained by Merchant as set forth in Section 2.11 for the crediting of collected funds and the debiting of fees and charges pursuant to the terms of this Agreement.
1.02 "ACH" means the Automated Clearing House [illegible] controlled by the Federal Reserve.
1.03 "Agreement" means these terms and conditions and any supplementary documents [illegible].
1.04 "Authorization" [illegible]
1.05 "Card" means (i) a valid credit card in the form issued under license from Visa U.S.A., Inc., Visa International, Inc. or MasterCard International, Inc. ("Bank Card"); or (ii) any other valid credit card accepted by Merchant by agreement with Bank and ISO.
1.06 "Card Associations" means Visa U.S.A., Inc., Visa International, Inc., MasterCard International, Inc., or any other Card issuers that provide Cards that are accepted by Merchant by agreement with Bank and ISO.
1.07 "Card Issuer" means the financial institution or company which has provided a Card to a Cardholder.
1.08 "Card Not Present (CNP)" [illegible]
1.09 "Cardholder" means the person whose name is embossed upon the face of the Card.
1.10 "Chargeback" [illegible]
1.11 "Credit Voucher" [illegible]
1.12 "Imprint" [illegible]
1.13 "Mid or Non-Qualifying Transaction" [illegible]
1.14 "Sales Draft" [illegible]
1.15 "Transaction" [illegible]
1.16 "Voice Authorization" [illegible]

### ARTICLE II - CARD ACCEPTANCE

2.01 Honoring Cards
Merchant will accept all valid Cards when properly presented by Cardholders in payment for goods or services. [illegible]

2.02 Advertising
(a) Merchant agrees to prominently display the promotional materials provided by Bank and ISO in its place(s) of business. [illegible]

2.03 Card Acceptance. When accepting a Card, Merchant will follow the steps provided by Bank and ISO for accepting Cards and will: (a) Determine in good faith and to the best of its ability that the Card is valid on its face; [illegible]

Initials: ______

business upon a mail, phone, e-commerce or pre-authorized order, Merchant will employ the use of fraud identification tools as required by Bank and ISO, including but not limited to, Address Verification System (AVS) processing and CVV2 processing, and acknowledges that use of said tools may prevent Merchant from accepting the payment [illegible]. Merchant will not [illegible] identification tools [illegible] by Bank and ISO. Merchant expressly acknowledges that the use of fraud identification tools may not prevent fraudulent Card usage, and that any transaction conducted by Merchant may ultimately result in a Chargeback, for which Merchant retains full liability pursuant to this Agreement.

2.04 Authorization

(a) Merchant will obtain an Authorization for all Card sales. If Merchant cannot, for any reason, obtain an electronic Authorization through the use of a terminal, Merchant will request a Voice Authorization from Bank's designated authorization center and will legibly print the authorization number on the Sales Draft. (b) Merchant shall not obtain or attempt to obtain authorization from Bank's authorization center unless Merchant intends to submit to Bank a Transaction for the authorized amount if Authorization for the Transaction is given. (c) Merchant shall not divide a single Transaction between two or more Sales Drafts on a single Card to avoid Authorization limits that may be set by the Card Issuer. (d) Merchant acknowledges that an Authorization provides only that the Cardholder account has sufficient credit available to cover the amount of the current sale and that an Authorization (i) is not a guarantee that the Transaction will not be subject to dispute or Chargeback or (ii) does not warranty the identity of the Cardholder. (e) Merchant shall not attempt to obtain an authorization by successively decreasing the sale amount. (f) Bank or ISO reserves the right to refuse to purchase or process any Sales Draft presented by Merchant (i) unless a proper authorization or approval code has been recorded on the Sales Draft; (ii) if Bank or ISO determines that the Sales Draft is or is likely to become uncollectible from the Cardholder to which the transaction would otherwise be charged; or (iii) if Bank or ISO has reason to believe that the Sales Draft was prepared in violation of any provision of this Agreement.

2.05 Retention and Recovery of Cards

(a) Merchant shall use its best efforts, by reasonable and peaceful means, to retain or recover a Card (i) when receiving such instructions when making a request for Authorization or (ii) if Merchant has reasonable grounds to believe the Card is counterfeit, fraudulent or stolen. (b) The obligation of Merchant imposed by this section to retain or recover a Card does not authorize a breach of the peace or any injury to persons or property, and Merchant will hold Bank and ISO harmless from any claim arising from any injury to person or property or other breach of the peace in connection with the retention or recovery of a Card.

2.06 Personal Information of Cardholders Merchant may not, as a condition of sale, impose a requirement on Cardholders to provide any personal information as a condition for honoring Cards unless such information is required to provide delivery of goods or services or Merchant has reason to believe the identity of the person presenting the Card may be different than that of the Cardholder.

2.07 Multiple Transaction Records; Partial Consideration Merchant shall not prepare more than one Sales Draft for a single sale or for a single item but shall include all items of goods and services purchased in a single Transaction in the total amount on a single Sales Draft except under the following circumstances (i) For purchases in separate departments of a multiple department store; (ii) For partial payment, installment payment, delayed delivery or an advance deposit; or (iii) For delayed or amended charges governed by rules for travel and entertainment merchants and Transactions.

2.08 Telephone Orders, Mail Orders, Internet/e-Commerce Orders, Preauthorized Orders and Installment Orders

(a) Unless Merchant has been approved by Bank to accept mail, phone or Internet/e-commerce orders, Merchant warrants that it is a walk-in trade business, located in a retail business place where the public moves in and out freely in order to purchase merchandise or obtain services. If Merchant is found to be accepting Card Transactions without Bank's authorization, which are placed by telephone, mail order, Internet, generated through telephone solicitation, or other means that does not create a Sales Draft that bears the Card imprint and Cardholder's signature, this Agreement may be immediately terminated by Bank and/or ISO and the value of all Sales Drafts collected from the first day of processing may be charged back to Merchant and all funds therefrom shall be held pursuant to Section 4. (b) Unless approved by Bank, this Agreement does not contemplate regular acceptance of Cards for sales accepted by telephone, mail, or internet/e-commerce, nor through pre-authorized orders. If an occasional Card Transaction is made by mail, phone or pre-authorized order, the Sales Draft may be completed without the Cardholder's signature or an imprint, but in such case Merchant shall create a Sales Slip containing Cardholder data, an Authorization number, the sale amount and the letters "MO", "TO" or "PO", as appropriate. Receiving an Authorization shall not relieve the Merchant of liability for Chargeback on any Transaction. With respect to any Card Transaction that is performed by means of mail, phone, and/or Internet/e-commerce order, Merchant shall in every instance perform an AVS inquiry and obtain a CVV2 match for the Cardholder's information, and otherwise comply with all terms of the Card Associations' regulations, as may be modified from time to time. (c) No delay or failure to assert any claim or exercise any right by Bank and/or ISO, including any claim or right to terminate the Merchant Account for violation of this section, shall constitute a waiver of any kind or otherwise abridge any right of Bank and/or ISO to enforce this Agreement and to take any action permitted hereunder.

2.09 Lodging and Vehicle Rental Transactions

(a) Merchant must estimate and obtain authorization for the amount of the Transaction based upon the Cardholder's intended length of stay or rental. Additional Authorization must be obtained and recorded for charges actually incurred in excess of the estimated amount. (b) Regardless of the terms and conditions of any written preauthorization form, the Sales Draft amount for any lodging or vehicle rental Transaction shall include only that portion of the sale, including any applicable taxes, evidencing a bona fide rental of real or personal property by Merchant to the Cardholder and shall not include any consequential charges. Nothing contained herein is intended to restrict Merchant from enforcing the terms and conditions of its preauthorization form through means other than a Card Transaction.

2.10 Returns and Adjustments, Credit Vouchers

(a) Merchant's policy for the exchange or return of goods sold and the adjustment for services rendered shall be established and posted in accordance with operating regulations of the applicable Card Association's regulations. Merchant agrees to disclose, if applicable, to a Cardholder before a Card sale is made, that if merchandise is returned: (i) no refund, or less than a full refund, will be given; (ii) returned merchandise will only be exchanged for similar merchandise of comparable value; (iii) only a credit toward purchases will be given; or (iv) special conditions or circumstances apply to the sale (e.g., late delivery, delivery charges or other non-credit terms). (b) If Merchant does not make these disclosures, a full refund in the form of a credit to the cardholder's Card account must be given. Disclosures must be made on all copies of Sales Drafts or invoices in letters approximately 1/4" high in close proximity to the space provided for the Cardholder's signature or on an invoice issued at the time of the sale or on an invoice being presented for the Cardholder's signature. (c) Any change in Merchant's return or cancellation policy must be submitted in writing to Bank and ISO not less than fourteen (14) days prior to the change. Bank or ISO reserves the right to refuse to process any Sales Draft made subject to a revised return or cancellation policy of which Bank and ISO have not been notified as required herein. Merchant is only permitted to issue credits/refunds to the cardholder's same Card account number used to process the original Sales Draft, in an amount equal to or less than the original Sales Draft amount. Bank and ISO reserves the right to refuse to process credits/refund transactions to cardholder's Card account in cases where Merchant cannot or is likely to be unable to make sufficient funds available to Bank for the issuance of said credits/refunds or in cases where the Bank or ISO have reason to believe that the issuance of said credits/refunds is the result of fraudulent behavior on the part of the Merchant.

2.11 Cash Payments Merchant shall not receive any payments from a Cardholder for charges included in any Transaction resulting from the use of any Card and receive any payment from a Cardholder to prepare and present a Transaction for the purpose of effecting a deposit to the Cardholder's Card account.

2.12 Cash Advances; Scrip Purchases Merchant shall not deposit any Transaction for the purpose of obtaining or providing a cash advance either on Merchant's Card or the Card of any other party and shall not accept any Card as a scrip purchase. Merchant agrees that either such action shall be grounds for immediate termination.

2.13 Duplicate Transactions Merchant shall not deposit duplicate Transactions. Merchant shall be debited for any adjustments for duplicate Transactions and shall be liable for any Chargebacks which may result there from.

2.14 Deposit of Fraudulent Transactions Merchant shall not accept or deposit any fraudulent Transaction and may not under any circumstances present for processing or credit, directly or indirectly, a Transaction which originated with any other merchant or any other source other than Transactions arising from bona fide purchases from Merchant for the goods and services for which Merchant has been approved under this Agreement. If Merchant deposits any prohibited Transaction, Merchant may be immediately terminated, and Bank may hold [illegible] escrow

[illegible] or Escrow pursuant to Sections 4.01 and 3.05; further, Merchant may be subject to the Visa and MasterCard reporting requirements set forth in Section 4.02 (c). Merchant understands and agrees that it is responsible for its employees' actions, whether negligent or fraudulent, while in its employ.

2.15 Collection of Pre-existing Debt Merchant shall not prepare and present to Bank for payment any Transaction representing the refinancing of an existing obligation of a Cardholder including, but not limited to, obligations (i) previously owed to Merchant, (ii) arising from the dishonor of a Cardholder's personal check, Chargeback, and/or (iii) representing the collection of any other pre-existing indebtedness, including collection of delinquent accounts on behalf of third parties.

2.16 Release of Cardholder Account Information Merchant will not, under any circumstances, release, sell or otherwise disclose any Cardholder's account number or any information relating to any Cardholder's account number or any Sales Drafts or Credit Vouchers which may have been imprinted with any Card to any person other than Bank, ISO or the applicable Card Association and, except as expressly authorized in writing by the Cardholder, or as required by law. Further, Merchant agrees to store any material containing Cardholder account information in a secure manner or destroy such information at the proper time in a fashion which renders the data unreadable. Merchant agrees to also notify Bank and ISO of any existing third party involved in the payment process that may have access to cardholder data and obtain approval from the Bank and ISO prior to entering into any third party agreement whereby such third party would have access to cardholder data.

2.17 Compliance with Card Association Rules Merchant shall comply with and conduct its Card activities in accordance with all applicable Card Association rules and regulations. Failure to comply with such rules and regulations may result in Merchant being terminated for cause and listed on various Card Association and industry databases, including the Terminated Merchant File and the Merchant Alert to Control High Risk Merchants file (MATCH). With respect to MasterCard or Visa USA, Merchant shall not (i) accept cardholder payments for previous Cards charges incurred at the Merchant location; (ii) establish a minimum or maximum transaction amount as a condition for honoring a Card; (iii) require a cardholder to complete a postcard or similar device that includes the cardholder's account number, card expiration date, signature, or any other card account data in plain view when mailed; (iv) add any surcharges to transactions; (v) add any tax to transactions, unless applicable law expressly requires that Merchant be permitted to impose a tax (any tax amount, if allowed, must be included in the transaction amount and not collected separately); (vi) enter into interchange any transaction receipt for a transaction that was previously charged back to Bank and subsequently returned to Merchant, irrespective of cardholder approval. Merchant may pursue payment from the customer outside the Card Association system; (vii) request or use an account number of any purpose other than as payment for its goods or services; (viii) disburse funds in the form of travelers cheques, if the sole purpose is to allow the cardholder to make a cash purchase of goods or services from Merchant; (ix) disburse funds in the form of cash, unless: Merchant is a Lodging or Cruise Line Merchant disbursing cash to a Cardholder, Merchant is dispensing funds in the form of travelers cheques, Cards, or foreign currency; or Merchant is participating in the Card Association Cash Back Service; (x) accept a Card for the purchase of scrip; (xi) accept a Card for manual cash disbursement; (xii) accept a Card to collect or refinance existing debt that has been deemed uncollectible by the Merchant providing the associated goods or services; or (xiii) enter into interchange a Transaction that represents collection of a dishonored check. Merchant shall be liable for payment of all Card Association fines, fees, penalties and any and all other assessments or indebtedness levied by Card Associations to Bank which are attributable, at the Bank's and/or ISO's sole discretion, to Merchant's transaction processing or business.

2.18 Merchant's Business

(a) Merchant shall provide Bank with immediate notice of its intent to (i) transfer or sell any substantial part of its total assets, or liquidate; (ii) change the basic nature of its business, including selling any products or services not related to its current business; (iii) change ownership or transfer control of its business; (iv) enter into any joint venture, partnership or similar business arrangement whereby any person or entity not a party to this Agreement assumes any interest in Merchant's business; (v) alter in any way Merchant's approved monthly volume, average ticket, and/or maximum ticket; or (vi) changes its return policies or to another fulfillment house different from those identified in Merchant Application. (b) Merchant shall provide Bank and ISO with prompt written notice if it becomes subject to any voluntary or involuntary bankruptcy or insolvency petition or proceeding. (c) Failure to provide notice as required above may be deemed a material breach and shall be sufficient grounds for termination of Merchant and for exercise by Bank and/or ISO of all their rights and remedies provided by this Agreement. In the event any of the changes listed above should occur, Bank and ISO shall have the option to renegotiate the terms of this Agreement or provide immediate notice of termination. (d) With notice and during Merchant's normal business hours, Bank or ISO's (duly authorized representative) may visit Merchant's business premises and may examine only that part of Merchant's books and records that pertain to the acceptance of Cards and Transactions processed.

2.19 Warranties of Merchant Merchant hereby provides the following warranties to Bank and ISO: (a) All information contained in Merchant's application for processing services or any other documents delivered to Bank and/or ISO in connection therewith is true and complete and properly reflects Merchant's business, financial condition and principal partners, owners or officers. (b) Merchant has the power to execute, deliver and perform this Agreement, and this Agreement is duly authorized, and will not violate any provisions of law, or conflict with any other agreement to which Merchant is subject. (c) Merchant has all licenses, if any, required to conduct its business and is qualified to do business in every jurisdiction where it is required to do so. (d) There is no action, suit or proceeding at law or in equity now pending or to Merchant's knowledge, threatened by or against or affecting Merchant which would substantially impair its right to carry on its business as now conducted or adversely affect its financial condition or operations. (e) Each Sales Draft presented to Bank for collection is genuine and is not the result of any fraudulent or prohibited Transaction, or is not being deposited on behalf of any business other than Merchant as authorized by this Agreement. Further, Merchant warrants that each Sales Draft is the result of a bona fide Card Transaction for the purchase of goods or services from Merchant by the Cardholder in the total amount stated on the Sales Draft. (f) Merchant has performed or will perform all of its obligations to the Cardholder in connection with the Card Transaction evidenced thereby. (g) Merchant has complied with Bank's procedures for accepting Cards, and the Card Transaction itself shall not involve any element of credit for any other purposes other than as set forth in this Agreement, and shall not be subject to any defense, dispute, offset or counterclaim which may be raised by any Cardholder under the Card Associations' rules, the Consumer Credit Protection Act (15 USC 1601) or other relevant state or federal statutes or regulations. (h) Merchant warrants that any Credit Voucher which it issues represents a bona fide refund or adjustment on a Card sale by Merchant with respect to which a Sales Draft has been accepted by Bank.

## ARTICLE III - PRESENTMENT, PAYMENT, CHARGEBACK

3.01 Acceptance Bank shall accept from Merchant all Sales Drafts deposited by Merchant under the terms of this Agreement and shall present the same to the appropriate Card Issuers for collection against Cardholder accounts. Merchant is required to transmit Sales Drafts and Credit Vouchers to Bank or its processing vendor on the same or next business immediately following the day that such Sales Drafts and Credit Vouchers have been originated. All presentment and assignment of Sales Drafts, collection therefore and re-assignment or rejection of such Sales Drafts are subject to the terms of this Agreement and regulations of the Card Associations. Bank shall only provisionally credit the value of collected Sales Drafts to Merchant's Account and reserves the right to adjust amounts collected to reflect the value of Chargebacks (actual and anticipated), fees, penalties, late submission charges, Reserve deposits, negative Sales Draft batch deposits and items for which Bank did not receive final payment.

3.02 Endorsement The presentment of Sales Drafts to Bank for collection and payment is Merchant's agreement to sell and assign all its right, title and interest in each Sales Draft completed in conformity with Bank's acceptance procedures and shall constitute an endorsement by Merchant to Bank of such Sales Drafts. Merchant hereby authorizes Bank to supply such endorsement on Merchant's behalf.

3.03 Prohibited Payments Bank shall have the sole right to receive payment of any Sales Draft presented by Merchant and paid by Bank unless and until there is a Chargeback. Unless specifically authorized in writing by Bank, Merchant shall not make or attempt to make any collections on any Sales Draft, including Chargebacks, and shall hold in trust for Bank and shall promptly deliver in kind to Bank any payment Merchant receives, in whole or in part, of the amount of any accepted Transaction, together with the Cardholder's name and account number and any correspondence accompanying the payment.

3.04 Chargebacks

(a) Merchant agrees to accept for chargeback any sale for which: (i) The Cardholder disputes the validity of the sale according to prevailing Card Association regulations. (ii) An Issuer or Bank determines that Merchant has in any way failed to comply with Card Association regulations or Bank's procedures in accepting a Card and presenting the resulting Sales Draft to Bank for purchase. (b) Section 2.03 notwithstanding, Merchant acknowledges that Bank shall have the right to charge back the amount of a Card sale for which the Cardholder [illegible]

Initials: [illegible]

authorized the charge if (i) the expiration of the Card or (ii) the signature of the Cardholder was not obtained by Merchant. (c) Merchant shall not initiate a sale Transaction in an attempt to collect a Chargeback. (d) Merchant agrees to pay the current published fees for each Chargeback as listed on Schedule A.

## ARTICLE IV - TERMINATION AND EFFECT OF TERMINATION

4.01 Term; Termination

(a) This Agreement shall become effective upon acceptance by Bank and shall continue for a period of two (2) years with successive two-year renewals thereafter until any party has provided written notice of non-renewal given no less than thirty (30) days from the end of the then-current term. Bank or ISO may terminate this Agreement immediately without prior notice if (i) either party has reason to believe that fraudulent Card Transactions or other activity prohibited by this Agreement is occurring at any Merchant location; (ii) such action is taken to prevent loss to Bank, ISO or Card Issuers; or (iii) the name of Merchant or any principal person associated with the Merchant Account appears on any Card Association's security reporting file. Notwithstanding the foregoing, this Agreement may be terminated at any time with or without cause and with or without notice by Bank and/or ISO. All rights and obligations of the parties existing hereunder as of the effective time of termination shall survive the termination hereof. (b) If any case or proceeding is commenced by or against Merchant or any principal person associated with the Merchant Account under any federal or state law dealing with insolvency, bankruptcy, receivership or other debt relief, this Agreement shall simultaneously therewith automatically terminate, and any amounts due to Bank or ISO shall accelerate and become immediately due and payable, without the necessity of any notice, declaration or other act whatsoever by either Bank or ISO. Notwithstanding such termination, Bank, in its sole discretion, may determine that Consent to Merchant's subsequent assumption of this Agreement is in Bank's and ISO's best interests. In such event, the assumption will be made under terms and conditions that are acceptable to Bank, including the provision for adequate security, and comply with the applicable federal or state laws governing such assumption.

Effect of Termination

(a) Suspension of Payment. In the event of termination regardless of cause, merchant expressly authorizes Bank to withhold and discontinue the disbursement for all Cards and other payment transactions of Merchant in the process of being collected and deposited. (b) Reserve Account. Collected funds will be placed in a non-interest bearing account of Bank (the "Reserve Account") until Merchant pays any or all personal cancellation fees and any outstanding charges, losses and/or expenses for chargebacks for which Merchant has agreed to provide indemnification under this Agreement. Further, Bank reserves the right to require Merchant to deposit additional amounts based upon Merchant's processing history and/or anticipated risk of loss to Bank into the Reserve Account. Bank and ISO shall be granted a continuing security interest in the Reserve Account. The Reserve Account shall be maintained a minimum of one hundred and eighty (180) days after the termination date and for any reasonable period thereafter during which Cardholder disputes may remain valid under the Card Associations' regulations. The provisions of this Agreement relating to the debiting and crediting of the Account shall be applied to the Reserve Account and shall survive termination of this Agreement until Bank terminates the Reserve Account. Any balance remaining after Chargeback rights have expired and all other expenses, losses and damages have been paid will be disbursed to Merchant (c) Reporting Merchant Account Termination. If the Merchant Account is terminated for cause, Merchant acknowledges that Bank may be required to report the Merchant's business name and the names and other identifying information of its principals to the Member Alert to Control High Risk Merchants (MATCH) file, or such similar merchant account security reporting file, maintained by Visa and/or MasterCard. Merchant expressly agrees and consents to such reporting in the event Merchant is terminated for any of the reason(s) established by the Card Association(s) for listing on the MATCH file. Furthermore, Merchant agrees to waive any and all claims against and to indemnify and hold harmless Bank and ISO from any claims which Merchant may raise against any party as a result of such reporting. (d) Discontinuance of Processing Activities. Upon termination of this Agreement and/or the Merchant Account for any reason, Merchant agrees that it will immediately cease requesting Authorizations. In the event Merchant obtains any Authorization after termination of this Agreement or the Merchant Account, Merchant expressly acknowledges and agrees that the fact that any Authorization was requested or obtained shall not operate to reinstate or extend Merchant's processing activities under this Agreement. (e) Surrender of Processing Records. Following termination of this Agreement and/or the Merchant Account, Merchant shall upon request provide Bank with all original and electronic copies of all Sales Drafts and Credit Vouchers that have been generated as a result of Merchant's processing activities during the term of this Agreement.

## ARTICLE V - MISCELLANEOUS

5.01 Account Monitoring Merchant acknowledges that ISO and/or Bank will monitor Merchant's daily deposit activity. Merchant agrees that Bank may upon reasonable grounds suspend the disbursement of Merchant's funds for any reasonable period of time required to investigate suspicious or unusual deposit activity. ISO and/or Bank will make good faith efforts to notify Merchant promptly. ISO and/or Bank shall have no liability for any losses, either direct or indirect, which Merchant may attribute to any suspension of funds disbursement.

5.02 Forms Merchant shall use only such forms or modes of transmission of Sales Drafts and Credit Vouchers as are provided or approved in advance by Bank or ISO, and Merchant shall not use such forms other than in connection with Card Transactions.

5.03 Records In addition to any records routinely furnished to Bank or ISO pursuant to this Agreement, Merchant shall preserve a copy of the actual paper Sales Drafts and Credit Vouchers and any written authorization of the Cardholder for at least two (2) years after the date Merchant presents the Transaction to Bank.

5.04 Requests for Copies Immediately upon receipt of any request by Bank or ISO, Merchant shall provide either the actual paper Sales Draft or a legible copy thereof (in size comparable to the actual Sales Draft) and any other documentary evidence available to Merchant and reasonably requested by Bank or ISO to meet Bank's obligations under law (including its obligations under the Fair Credit Billing Act) or otherwise to respond to questions concerning Cardholder accounts.

5.05 Compliance with Law Merchant shall comply with all laws applicable to Merchant, Merchant's business and any Card Transaction, including without limitation all state and federal consumer credit and consumer protection statutes and regulations.

5.06 Fees, Charges and Fines Merchant shall pay to Bank, the fees and charges set forth on Schedule A and/or other pricing Schedules, including any additional charges applied to transactions that fail to meet Card Association requirements for the lowest interchange levels. Merchant's Account will be debited through ACH or withheld from daily payments to Merchant for such amounts and for any other fees, charges or adjustments incurred by Merchant and associated with processing services. In the event collection of such amounts, fees, charges or adjustments is unsuccessful through the ACH or from being withheld from daily payments to Merchant, Merchant agrees to allow Bank and ISO to initiate a sales transaction on any credit or debit card(s) provided by Merchant to Bank and ISO. Bank and ISO shall have the right to change fees, including adding fees for additional services utilized by Merchant in accordance with Sections 5.08 and 5.11. In the event Merchant's transaction processing, including but not limited to excessive [illegible] transactions or chargebacks, amounts to violation any Card Association rule and regulation or Bank and/or ISO requirements, Bank and/or ISO may unilaterally undertake one or more of the following measures (i) increase or impose a risk reserve and to deposit such reserves into the Reserve Account, (ii) increase a discount rate surcharge, (iii) impose a surcharge to existing Retrieval Request and/or Chargeback fees. Merchant acknowledges that it is familiar with Card Association rules and regulations, and that though Bank and ISO may notify Merchant of any changes to Card Association rules and regulations, it is under no obligation to do so. (iv) Impose an administrative fee.

5.07 Security Merchant agrees that all of its obligations under this Agreement shall be secured to Bank and ISO by all deposit accounts maintained by Merchant with Bank, including deposits made by Merchant as collateral or funds withheld by Bank or ISO as the result of routine security monitoring, and by all other personal property that serves as collateral for any other indebtedness arising out of Merchant's business and owed by Merchant to Bank or ISO. Merchant agrees that if Bank determines that the proceeds of Merchant's future Card sales are not likely to cover anticipated Chargebacks, credits, fees and adjustments, as reasonably determined by Bank or ISO (whether because this Agreement has been terminated or for any other reason), Bank may fully or partially prohibit withdrawal by Merchant of funds from Merchant's deposit accounts maintained with Bank in Bank's discretion, pending a determination from time to time by Bank and ISO to exercise their respective rights as a secured party against such accounts in partial or full payment of Merchant's obligations to Bank and ISO.

5.08 Modifications to Agreement This Agreement is subject to amendment to conform with Card Association regulations, as amended from time to time. From time to time Bank and ISO may amend any provision or provisions of this Agreement, including, without limitation, those relating to the discount rate or to other fees and charges payable by Merchant by notifying Merchant of the amendments pursuant to the notice provisions of Section 5.13, and such amendments shall become effective immediately. If Merchant does not desire to be bound by any such new amendments to this Agreement, Merchant shall notify Bank and ISO within five (5) calendar days of its election to terminate this Agreement. If Merchant fails to make such notice during the time allotted, termination of this Agreement shall be governed pursuant to Section 4.01 of this Agreement.

5.09 ISO MAKES NO WARRANTIES REGARDING THE USE, OPERATION OR PERFORMANCE OR NON-PERFORMANCE OF SOFTWARE AND SYSTEMS UTILIZED FOR THIS AGREEMENT, WHETHER EXPRESS OR IMPLIED, AND ISO EXPRESSLY DISCLAIMS ALL IMPLIED WARRANTIES, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

5.10 Supplementary Documents References to "this Agreement" include any valid schedules, appendices and amendments thereto.

5.11 Limitation of Liability; Indemnity

(a) Bank's and ISO's liability, whether joint or several, with respect to any Card Transaction shall not exceed the amount of the Sales Draft in connection with that Transaction less any applicable fees and charges. Bank and ISO shall in no event be liable for any incidental or consequential damages whatsoever. (b) Neither ISO nor Bank shall be liable for any losses, claims, demands, penalties, actions, delays, costs or expenses, including reasonable attorney's fees, of any kind unless Merchant provides written notice to ISO or Bank of the occurrence that gave rise to the alleged liability within thirty (30) days of the date Merchant knew or should have known of the occurrence. (c) Merchant hereby agrees to indemnify and hold Bank and ISO harmless from any claim relating to any Sales Draft paid for by Bank as may be made by anyone by way of defense, dispute, offset, counterclaim or affirmative action, or for any damages of or losses that either Bank or ISO may incur as a result of Merchant's breach of this Agreement. Further, Merchant shall reimburse Bank or ISO, as the case may be, for all expenses and costs, including attorney's fees, with regard thereto.

5.12 Waiver Failure by Bank or ISO to enforce one or more of the provisions of this Agreement shall not constitute a waiver of the right to enforce the same or other provision in the future.

5.13 Notices You agree that this Agreement constitutes "a writing signed by You" under any applicable law or regulation. To the fullest extent permitted by applicable law, this Agreement and any other agreements, notices or other communications regarding your account and/or your use of the Service ("Communications"), may be provided to you electronically and you agree to receive all Communications from Bank and ISO in electronic form. Electronic Communications may be posted on the pages within the Bank or ISO website and/or delivered to your e-mail address. You may print a copy of any Communications and retain it for your records. All Communications in either electronic or paper format will be considered to be in "writing," and to have been received no later than five (5) business days after posting or dissemination, whether or not you have received or retrieved the Communication. Bank and ISO reserves the right but assumes no obligation to provide Communications in paper format. If Communications are provided by Bank or ISO in paper format to Merchant, such Communications shall be deemed delivered when mailed first class mail to Merchant at the address provided as the billing address and as the address listed on the Merchant Application. All notices and other communications required or permitted under this Agreement by Merchant to Bank and/or ISO shall be deemed delivered when mailed first class mail, postage prepaid, addressed as follows: a) PDS Card Systems, 777 North 1550 East, Suite 224, Orem, UT 84097, Attn: Merchant Services; b) Merrick Bank Corporation, 10705 South Jordan Gateway, Suite 200, South Jordan, UT 84095, Attn: Manager of Merchant Services.

5.14 Choice of Law; Jurisdiction Any claim or cause of action arising out of this Agreement against Bank either shall be initiated and maintained in the state courts located in Salt Lake County, Utah, in which case this Agreement shall be governed and construed under the laws of that state. Any other claim or cause of action, regardless of which party shall be the complainant, shall be initiated and maintained in the state courts located in Utah County, Utah, in which case this Agreement shall be governed and under the laws of the State of Utah.

5.15 Entire Agreement; Assignability This Agreement expresses the entire understanding of the parties with respect to the subject matter hereof and except as provided herein, may be modified by only in writing, pursuant to Section 5.08. This agreement may not be assigned, directly or by operation of law, without the prior written consent of Bank and ISO. This Agreement shall be binding upon and inure to the benefit of the parties' respective heirs, personal representatives, successors and assigns.

5.16 Deposit Account Merchant shall at all times maintain an Account at a bank that is a member of the Federal Reserve ACH System and shall provide Bank and ISO with proper authorization for debiting of the Account. All credits for collected funds and debits for fees, payments and Chargebacks and other amounts for which Merchant is liable under the terms of this Agreement, including executing ACH debits or credit entries, shall be made to the Account. Merchant may not close or change the Account without written notice to Bank or ISO. Merchant will be solely liable for all fees and costs associated with the Account and for all overdrafts. Merchant hereby grants to Bank and ISO a security interest in the Account to the extent of any and all fees, payments and Chargebacks and other amounts due which may arise under this Agreement, and Merchant shall execute any document and obtain any consents or Waivers from the bank at which the Account is maintained as requested by Bank or ISO to protect their security interests therein. This Automated Clearing House authorization cannot be revoked until all Merchant obligations under this Agreement are satisfied.

5.17 Credit and Financial Inquiries; Additional Locations; Inspections

(a) Merchant authorizes Bank and ISO to make, at any time, any credit inquiries which they may consider necessary to accept or review acceptance of this Agreement or investigate Merchant's deposit or Card acceptance activities subsequent to acceptance of this Agreement. Such inquiries shall include, but are not limited to, a credit check of all of the business including its proprietors, partners, principal owners or shareholders or officers. Merchant, including any person signatory to the Merchant Agreement, authorizes the release to Bank, ISO and/or their designees of any and all information and documentation that they request, whether of a personal or business nature. Such information includes, but is not limited to, employment history and income; bank, money market, and checking account balances; credit history; and copies of Federal and State income tax returns. Bank and ISO may provide this authorization, or any facsimile thereof, to any party named in the Merchant Application and Agreement. If requested to do so by Bank or ISO, Merchant shall provide the written consent of any person for which an inquiry has been or is to be made if such person has not executed this Agreement and will provide any financial statements, income tax and business tax returns and other financial information as Bank or ISO may consider necessary to perform initial or periodic reviews of Merchant's financial stability and business practices. (b) Merchant may accept Cards only at locations approved by Bank. Additional locations may be added, subject to Bank's and ISO's approval. Any party to this Agreement may delete any location by providing notice as provided herein. (c) Merchant agrees to permit Bank or ISO, at any time and from time to time, to inspect locations to confirm that Merchant has or is adhering to the terms of this Agreement and is maintaining the proper facilities, equipment, inventory, records and license or permit (where necessary) to conduct its business. However, nothing in this paragraph shall be deemed to waive Merchant's obligation to comply in all respects with the terms of this Agreement. (d) Representatives of Bank or ISO may, during normal business hours, inspect, audit and make copies of Merchant's books, accounts, records and files pertaining to any Card Transaction.

5.18 Marketing of Non-Bankcard Services by ISO From time to time, ISO may offer to Merchant certain additional products and services which may or may not be related to the processing of credit card Transactions. In the event of such offer, Merchant must indicate its desire to ISO to decline such offers or be deemed to have accepted the offers and be liable for payment therefor.

5.19 Exclusivity During the initial and any renewal term of this Agreement, you will not enter into an agreement with any other entity that provides credit card or debit card processing services similar to those provided by Bank and ISO as contemplated by this Agreement without Bank's and ISO's written consent.

5.20 Acceptable Use Policy Bank and ISO have established an Acceptable Use Policy (AUP) that governs usage of the Merchant Account by Merchant, as more fully described at the ISO's website ([illegible]), which is made part of the Agreement by this reference. In general terms, the AUP prohibits Merchant from using the Merchant Account for illegal activities, as well as for certain prescribed business types and/or for the sale of certain prescribed products or services. Bank and ISO reserve the right to revise or make exceptions to the AUP. Notice of revisions to the AUP will be made in accordance with Section 5.13 of this Agreement.

Initials [signature]

2007-05-21 15:35 BANK OF THE WEST 6503254386 > 3908936 P 7/21

POS CARD SYSTEMS

To be filled out by POS Card Systems Sales Representative

[illegible]

Merchant Name: PALO Alto Sol

| Fees | Monthly Fee | Per Item/Transaction Fee | Set-up/One-Time Fee |
|---|---|---|---|
| Wireless Service | ~~$20.00~~ | ~~$0.10~~ | |
| Minimum Discount Fee | | | |
| Equipment Rental Fee | | | |
| Maintenance Fee | | | |
| Online Access Fee | | Email Address: | |
| Other Fee | | | |

| Card Type/Service | | Discount Rate | Per Item/Transaction Fee |
|---|---|---|---|
| EBT - Electronic Benefits | | % | $ |
| Check Service | Attach Check Service Application | % | $ |
| Gift Card | Attach Gift Card Application | % | $ |
| SCAN | Attach SCAN Service Application | % | $ |
| Check Imaging | Attach Check Imaging Application | % | $ |
| ACH | Attach ACH Application | % | $ |
| Other | | % | $ |

| Equipment Type | Quantity | | Price/Unit | Sub-Total |
|---|---|---|---|---|
| Terminal Type: OMNI VX 570 (Head) (2 Mo.) | 1 | ☐ Customer Owned ☑ Supplied by POS | $ | $ 0 |
| Pin Pad Type: ☐ Internal ☐ External | | ☐ Customer Owned ☐ Supplied by POS | $ | $ |
| Printer Type: | | ☐ Customer Owned ☐ Supplied by POS | $ | $ |
| Check Reader Type: | | ☐ Customer Owned ☐ Supplied by POS | $ | $ |
| Card Reader Type: | | ☐ Customer Owned ☐ Supplied by POS | $ | $ |
| Software Type: | | ☐ Customer Owned ☐ Supplied by POS | $ | $ |
| - Additional Software Users: | | | $ | $ |
| Hand Imprinter: | | ☐ Customer Owned ☐ Supplied by POS | $ | $ |
| | | | 8.25% Sales Tax | $ |
| | | | Equipment Sub-Total | $ 0 |

Ship To: ☐ Merchant ☐ Sales Rep ☐ Other Bill Shipping: ☐ Merchant ☐ Sales Rep

If Other Name:

Address: City: State: Zip:

**INTERNET MERCHANT**

☐ MTREX (☐ Merchant Interface ☐ API) ☐ Authorize.Net ☐ Plug'n Pay ☐ Other: (fill in name)

Monthly Gateway Fee $ Internal Per Transaction Fee $ Recurring Billing $ Setup-Fee $

☐ CartManager Monthly Fee: $ Setup-Fee $

Merchant URL:

Merchant Email Address:

Internet Sub-Total $

**BILLING/PAYMENT METHOD**

☐ Check payable to POS Card Systems

☑ ACH Merchant Account for Applications, Terminals, and Supplies TOTAL Payment $ 0

☐ Bill Merchant on Visa/MasterCard ______ Exp: __ __ / __ __

☐ Bill Merchant $________ for ______ Months

**PROCESSOR**

☑ Vital ☐ Paymentech ☐ Other: ________

Auto Close: ☐ Yes ☑ No Time: ________ ☐ Am ☐ PM ☐ EST ☐ CST ☐ MST ☐ PST

**TERMINAL PROMPTS**

[illegible]

| | |
|---|---|
| ☑ AVS | ☐ Multi Merchant |
| ☐ CVV2 | ☐ Clerk ☑ Server 15 SERVERS |
| ☑ Tip Prompts | ☐ Tip Assist |
| ☐ Business to Business (B2B) | ☐ Dial Phone Prefix ☐ 8 ☐ 9 ☐ Other: ____ |
| | IP ☐ Dynamic IP Address ☐ Static IP Address: ____ |

EXHIBIT 3

Print This Page

Wednesday, January 06, 2010 — 12:57:27 (CST)

Pivotal Payments acquires POS Card Systems and NCCP from Vision Bankcard

Melville, N.Y., Jan. 5, 2010 -- Pivotal Payments announced today that they have completed the acquisitions of POS Card Systems and National Credit Card Processing, both divisions of Orem based Vision Bankcard, Inc. These acquisitions increase Pivotal Payments' merchant portfolio to 40,000 merchants and will add over 30 independent sales agents and 120 agent bank branches to its expanding sales channels.

Pivotal Payments has to date completed six acquisitions and grown to over 280 employees and 600 sales agents. The company now services over 40,000 merchants in both the U.S. and Canada and processes over $7 billion in annual transaction volume. Goldman Sachs is Pivotal's primary financial partner and was the exclusive provider of acquisition financing for this transaction.

"Pivotal is pleased to end the year on this positive note," said Philip Fayer, President and CEO of Pivotal Payments. "This acquisition will add to our strong organic growth and will increase our presence in the U.S. Pivotal will maintain both the offices of acquired divisions in Redwood City, California and Novi, Michigan and would like to welcome these Vision employees to the Pivotal family."

"We are very happy with the transaction with Pivotal. We are confident that we delivered value for our shareholders while assuring the long-term growth and success of our employees and sales agents," said Vision Bankcard, Inc President Jeff Knowles.

About Pivotal Payments

Pivotal Payments, a privately held company, is a leading merchant services provider with offices across North America. The company provides a full suite of merchant services to small and mid-sized retail businesses, mail order/telephone order merchants, e-commerce, chain stores, franchises, restaurants, and dealerships. Merchant services include credit and debit card processing, electronic check conversion, merchant cash advances, loyalty and gift card programs, as well as terminal management solutions.

Company and product information are available at www.pivotalpayments.com .

About POS Card Systems

POS Card Systems, a division of Vision Bankcard, Inc., was founded in 1992. Located in Redwood City, California, the company serves local, regional and national merchants. Their local sales partners work with regional financial institutions to offer merchant payment processing services through their agent bank programs. POS Card Systems' sales partners are recognized within the industry for their high level of ethical and professional business practices. They have built a solid base of customers in their respective regions and their low merchant attrition rate can be attributed to their excellent merchant support, understandable pricing and full disclosure policies.

Company and product information are available at www.pos-west.com .

About National Credit Card Processing

National Credit Card Processing (NCCP) provides reliable merchant services that enable merchants to accept credit, debit and gift cards. Other payment processing services include check guarantee, anti-fraud measures and Internet merchant accounts.

Founded in 1993, located in Novi Michigan, NCCP has 24-hour turnaround on merchant applications and in-house financing on all makes and models of point-of-sale terminals and equipment. NCCP provides 24/7 customer support and 24-hour replacement for equipment failure.

Company and product information are available at www.nccp-us.com .

Source: Company press release.

EXHIBIT 4

## SCHEDULE A

☒ Daily ☐ Monthly Merchant Type: ☒ Retail ☐ MOTO ☐ E-Commerce

| Card Type Accepted | Discount Rate: Qualified | Mid-Qualified | Non-Qualified | Transaction Fee: Qualified | Mid-Qualified | Non-Qualified | Authorization Fee |
|---|---|---|---|---|---|---|---|
| | | | | | | | $ .15 |
| Visa Check Card | .10% | .10% | .10% | $ | $ | $ | $ .15 |
| Visa Credit Card | .10% | .10% | .10% | $ | $ | $ | $ .15 |
| M/C Check Card | .10% | .10% | .10% | $ | $ | $ | $ .16 |
| M/C Credit Card | [illegible]% | .10% | .10% | $ | $ | $ | $ .15 |
| Discover Check Card | .10% | .10% | .10% | $ | $ | $ | $ .15 |
| Discover Credit Card | .10% | .10% | .10% | $ | $ | $ | $ 0.20 |
| American Credit Bureau (JCB) | 2.95% | | | $ | | | $ |
| PIN-based (Online) Debit | ☐ Yes ☒ No | | | ☐ Debit Network Pass-through*** | | | $ 0.20 |
| Interchange and Assessments | ☒ Pass-through* | | | EBT | | | |
| Bi-back Surcharge | % | | | | | | |

### OTHER AUTHORIZATION FEES

| | | |
|---|---|---|
| American Express Authorization | % | per item $ |

### OTHER SERVICE FEES

| Fee | Amount | Unit | Fee | Amount | Unit |
|---|---|---|---|---|---|
| Setup Fee | $ | per Application | Batch Fee | $ | per Batch |
| Statement Fee - Monthly | $ 8 | per Merchant ID | Terminal Reprogramming Fee | | per Terminal |
| Online Reporting Fee - Monthly | $ | per Merchant ID | Merchant Club - Monthly ☐** | $ | per Terminal ID |
| Monthly Minimum Fee** | $ | per Merchant ID | Wireless Terminal Set-up Fee | | per Terminal |
| Gateway Fee - Monthly | $ | per Gateway | [illegible] | $ | per [illegible] ID |
| Debit Access - Monthly | | per Merchant ID | Other | $ | |
| Chargeback Fee | $25 | per Chargeback | | | |
| Retrieval Fee | $ 10 | per Retrieval | | | |

[illegible fine print]

### ADDITIONAL CARD BRANDS

☐ New Amex Acct or Existing Amex Acct #:

Check one: ☐ Reverse PIP ☐ None

☐ Existing EBT #:

### MERCHANT APPLICATION AND AGREEMENT ACCEPTANCE

By executing this Merchant Application and Agreement on behalf of the merchant described above ("Merchant"), the undersigned individual(s) represent(s), warrant(s), and acknowledge(s) that: (i) All information contained in this Merchant Application ("Application") is true, correct and complete as of the date of this Application; (ii) if the Merchant is a corporation, limited liability company or partnership, the individual(s) executing this Application have the requisite legal power and authority to complete and submit this Application on behalf of the Merchant and to make and provide the acknowledgements, certifications and agreements set forth herein on behalf of the Merchant and individually; (iii) The information contained in this Application is provided for the purpose of obtaining or maintaining a merchant account for the Merchant with the Sponsor Bank ("BANK") and BANK will rely on the information provided herein in its approval process and in setting the [illegible] [illegible] [illegible] [illegible] [illegible] [illegible] [illegible]. Merchant agrees to pay such approved fees [illegible]. (iv) The undersigned has received, [illegible] Merchant Agreement; (v) The Merchant Agreement will not take effect until Merchant has been approved by BANK [illegible] [illegible] the Merchant Agreement, which is incorporated herein by reference thereto, and agrees on behalf of the Merchant to be bound by the terms of such Merchant Agreement. [illegible] Pivotal Payments will rely on the representations and warranties set forth in this Application for Merchant Agreement and unless otherwise specified or permitted by Association or applicable law, Pivotal Payments will have all the rights of BANK under the Merchant Application and Agreement.

You have the option of accepting MasterCard credit cards, Visa credit cards, credit cards issued by Discover, MasterCard signature debit cards (MasterCard Debit Cards) or Visa signature debit cards (Check Cards) or debit cards issued by Discover. You may elect to accept any or all of these card types for payment. If you do not specifically indicate otherwise, your application will be processed to accept ALL MasterCard, Discover, and Visa card types.

Record Visa, Discover or M/C card types NOT to accept: __________

| MERCHANT: | BANK: |
|---|---|
| Principal Signature X: [signature] | By: ________ Date: ________ |
| Print Name: HECTOR SOL Date: 9/28/10 | Name and Title: ________ |
| | **PIVOTAL PAYMENTS INC.:** |
| Principal #2 Signature X: ________ | By: ________ Date: ________ |
| Print Name: ________ Date: ________ | Name and Title: ________ |

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: Gautam Dutta, Esq. (SBN 199326) 39270 Paseo Padre Pkwy #206 Fremont, CA 94538 TELEPHONE NO.: 415.236.2048 FAX NO. *(Optional)*: 213.405.2416 E-MAIL ADDRESS *(Optional)*: Dutta@BusinessandElectionLaw.com ATTORNEY FOR *(Name)*: Hector Sol, d/b/a Vive Sol, and d/b/a Palo Alto Sol | *FOR COURT USE ONLY* |
|---|---|
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF Santa Clara STREET ADDRESS: 191 N. First St. MAILING ADDRESS: CITY AND ZIP CODE: San Jose 95113 BRANCH NAME: Downtown Superior Court (DTS) | |
| PLAINTIFF/PETITIONER: Hector Sol, d/b/a Vive Sol, and d/b/a Palo Alto Sol DEFENDANT/RESPONDENT: Pivotal Payments, Inc. | CASE NUMBER: 111-CV-212705 |
| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.: |

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of:
   a. [✓] summons
   b. [✓] complaint
   c. [✓] Alternative Dispute Resolution (ADR) package
   d. [ ] Civil Case Cover Sheet *(served in complex cases only)*
   e. [ ] cross-complaint
   f. [✓] other *(specify documents)*: Civil Lawsuit Notice
3. a. Party served *(specify name of party as shown on documents served)*:
   Pivotal Payments, Inc.

   b. [✓] Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a)*:
   Philip Fayer (President & CEO, Pivotal Payments, Inc.)
4. Address where the party was served:
   c/o Corporation Service Company, 2711 Centerville Rd., Suite 400, Wilmington, DE 19808
5. I served the party *(check proper box)*
   a. [ ] **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date)*: (2) at *(time)*:
   b. [ ] **by substituted service.** On *(date)*: at *(time)*: I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3)*:

      (1) [ ] **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.

      (2) [ ] **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

      (3) [ ] **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.

      (4) [ ] I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on *(date)*: from *(city)*: or [ ] a declaration of mailing is attached.

      (5) [ ] I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
POS-010 [Rev. January 1, 2007]

PROOF OF SERVICE OF SUMMONS

Code of Civil Procedure, § 417.10

| PLAINTIFF/PETITIONER: Hector Sol, d/b/a Vive Sol, and d/b/a Palo Alto Sol | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Pivotal Payments, Inc. | 111-CV-212705 |

5\. c. [✓] **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

(1) on *(date)*: Nov. 9, 2011 (2) from *(city)*: Fremont

(3) [ ] with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgement of Receipt.*)* (Code Civ. Proc., § 415.30.)

(4) [✓] to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. [ ] **by other means** *(specify means of service and authorizing code section):*

[ ] Additional page describing service is attached.

6\. The "Notice to the Person Served" (on the summons) was completed as follows:

a. [ ] as an individual defendant.
b. [ ] as the person sued under the fictitious name of *(specify):*
c. [ ] as occupant.
d. [✓] On behalf of *(specify):* Pivotal Payments, Inc.
under the following Code of Civil Procedure section:

[✓] 416.10 (corporation)
[ ] 416.20 (defunct corporation)
[ ] 416.30 (joint stock company/association)
[ ] 416.40 (association or partnership)
[ ] 416.50 (public entity)
[ ] 415.95 (business organization, form unknown)
[ ] 416.60 (minor)
[ ] 416.70 (ward or conservatee)
[ ] 416.90 (authorized person)
[ ] 415.46 (occupant)
[ ] other:

7\. **Person who served papers**

a. Name: Gautam Dutta
b. Address: 39270 Paseo Padre Pkwy # 206, Fremont, CA 94538
c. Telephone number: 415.236.2048
d. The fee for service was: $ 0
e. I am:

(1) [✓] not a registered California process server.
(2) [ ] exempt from registration under Business and Professions Code section 22350(b).
(3) [ ] a registered California process server:
(i) [ ] owner [ ] employee [ ] independent contractor.
(ii) Registration No.:
(iii) County:

8\. [✓] **I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.**

or

9\. [ ] **I am a California sheriff or marshal and I certify that the foregoing is true and correct.**

Date: Nov. 9, 2011

Gautam Dutta
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)

[signature]
(SIGNATURE)



Dutta, Esq
39270 Paseo Padre Pkwy #206
Fremont, CA 94538
U.S. POSTAGE
PAID
FREMONT, CA
94536
NOV 09, 11
AMOUNT
$7.23
00052960-03
1000
19808
RETURN RECEIPT
REQUESTED
Philip Fayer
President & CEO
Pivotal Payments, Inc.
c/o Corporation Service Company
2711 Centerville Rd., Suite 400
Wilmington, DE 19808
CERTIFIED MAIL
7011 1150 0000 1351 7096